**KAPIOLANI HOSPITAL, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–2790.

United States Court of Appeals, Ninth Circuit.

Aug. 31, 1978.

Jared H. Jossem (argued), of Torkildson, Katz & Jossem, Honolulu, Hawaii, for petitioner.

William R. Stewart, Atty. (argued), Washington, D. C., for N.L.R.B.

Before BROWNING and ANDERSON, Circuit Judges, and DAVID W. WILLIAMS,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

This petition presents for review a Board order that the employer, Kapiolani Hospital, violated § 8(a)(1) and (3) of the National Labor Relations Act (Act) [29 U.S.C. § 158(a)(1) and (3)], by discharging an unrepresented ward clerk because she refused to cross the picket line of the striking registered nurses. Petitioner claims that the employee was not protected from termination by the Act because she failed to give

the 10 days' advance notice under 8(g) [29 U.S.C. § 158(g)] of the Act that is required of a striking labor organization and because the employee failed to give two hours' prior notice of her absence as is required by hospital rules.

FACTS

Petitioner Kapiolani Hospital (Hospital) is an acute care hospital engaged in providing maternity, obstetrical, and gynecological care. It is the primary obstetrical care facility for the Island of Oahu. The maternity section of the Hospital is divided into the labor and delivery unit, the first postpartum (special care) unit, the nursery, and the second postpartum unit. Ward clerk Kiyohara was assigned to the second postpartum unit. Other members of the nursing staff include registered nurses (RNs), licensed practical nurses (LPNs), technicians, nurses aides and secretaries. The RNs were represented by the Hawaii Nurses' Assoc., (HNA) and the LPNs were represented by the United Public Workers. The ward clerks and secretaries were not represented.

Kiyohara was employed in November of 1974 as a ward clerk. She served on the evening shift from 3 p.m. to 11 p.m., working a 5-day, 40-hour week. As a ward clerk her duties included answering a telephone at a desk located in the corridor of the second postpartum station, responding to patient calls, either by dispatching a nurse or by going herself to the patient room to determine the need, assisting doctors and nurses by accompanying them on rounds, carrying charts, charting temperatures and pulses and filing lab reports. Generally, the ward clerks assisted in various clerical capacities to free the nurses and doctors for patient care.

The Hospital maintains a call-in rule that provides for suspension or discharge of any employee for:

"Absence from work without giving notice (unless the giving of notice is not

---

* The Honorable David W. Williams, United States District Judge, Central District of California, sitting by designation.

possible), irregular attendance at work or habitual tardiness in reporting for work." Kiyohara knew of the rule from her orientation training it was established procedure by employees to give two hours' notice of any intended absence or tardiness. This practice was not invariably followed. Termination would not result if the failure to call in was for a reason deemed valid to management. On two prior occasions Kiyohara had not been disciplined for failure to give two hours' notice of an intentional absence.

Collective bargaining between the Hospital and HNA over an agreement expiring in November of 1975 broke down and the union gave notice of its intention to strike.

In preparation for the strike, the Hospital adopted a special staffing schedule to handle the highest priority cases. Admissions were restricted. Twelve supervisory RNs were assigned to replace the 60 striking RNs. The substitute RNs were assigned to 12-hour shifts. The shifts of other personnel were also modified. A system of transfers of personnel to areas of greatest need was also instituted. On January 26, Unit Manager Meheula informed the postpartum unit employees that the gynecology staff would assist in covering the obstetrics unit and that there would be no layoffs or leaves of absence during the strike.

Kiyohara was not scheduled to work on the first two days of the strike. She was scheduled to return to work at 3:30 p.m., January 30, the third day of the RN strike.

Five weeks prior to the strike, Kiyohara had inquired of Tullier, a member of the HNA negotiating team, if she would be liable for malpractice if she provided patient care or bedside assistance during the strike. She was advised only to perform her normally assigned duties. About two weeks prior to the strike, Kiyohara asked Tullier if she had the right to withhold her services in support of the strike. Tullier stated that though she was not certain, she thought Kiyohara would have the rights of all strikers. On January 29 Kiyohara asked for authoritative information about her rights if she honored the picket line. Tulli-

er consulted with legal counsel for the union and reported back to Kiyohara that she had the right to honor the picket line and that she would lose her job only if she were replaced during the strike. In response to a question by Kiyohara, Tullier stated that Kiyohara did not have to give the Hospital notice of her intention to honor the picket line, but that if the Hospital contacted her, Kiyohara should inform them that she was honoring the picket line.

On January 30 Kiyohara spent the afternoon at a neighbor's house. Kiyohara attempted to call her supervisor at 2:45 p.m., but was unsuccessful and left no message.

Meanwhile, the Hospital attempted to contact her. She was finally reached by Unit Manager Meheula at 7:15 p.m., when she returned home. Meheula identified herself and asked Kiyohara why she had not reported as scheduled. Kiyohara, after hesitation, stated that she had decided to honor the picket line. Meheula stated that Kiyohara would still be considered on time if she came in after the call. Kiyohara declined. Meheula informed her that she would not have a job if she failed to report. Kiyohara stated that she understood. Kiyohara then received a notice of termination which stated that she was terminated because she "did not show up for work as scheduled."

PROCEEDINGS BELOW

Kiyohara filed a charge on March 26, 1976. A complaint was issued by the Regional Director in July. The administrative law judge heard the matter on October 21–23, 1976, and found that the Hospital violated § 8(a)(1) and (3) by terminating Kiyohara because she refused to cross the picket line. On July 29, 1977, the NLRB issued an order affirming the administrative law judge. The order requires the Hospital to cease and desist from its unfair labor practice and to offer reinstatement and back pay. 231 N.L.R.B. No. 10 (1977).

The Hospital has petitioned this court to review and set aside an order by the Board. The Board has cross-applied for enforce-

ment. This court has jurisdiction under § 10(e) and (f) of the Act [29 U.S.C. § 160(e) and (f)].

## SECTION 8(g) AND ITS RELATION TO KIYOHARA

In relevant part § 8(g) *provides that*: "(g) A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention . . . ."

■ Prior to the enactment of Section 8(g), employees of certain hospitals were exempt from the protections of the National Labor Relations Act. Section 8(g) was enacted as a compromise to bring these employees under the Act. The legislative history shows that on the one hand, "[t]he Committee could find no acceptable reason why 1,427,012 employees of these non-profit, non-public hospitals, representing 56% of all hospital employees, should continue to be excluded from the coverages and protections of the Act." S.Rep. 93–766 (1974) H.R.Rep. 93–1051 (1974), U.S.Code Cong. & Admin.News 1974, p. 3948. On the other hand, "[i]t is in the public interest to insure the continuity of health care to the community and the care and well being of patients by providing for a statutory advance notice of any anticipated strike or picketing." (*Id.* p. 3949) Therefore, the Committee approved an amendment adding a new Section 8(g) "which generally prohibits a labor organization from striking or picketing a health care institution without first giving 10 days' notice." (*Id.*)

■ The question which faces us here is whether or not this 10-day notice period of Section 8(g) applies to Kiyohara, an individual unrepresented employee. We hold that the notice provision of Section 8(g) does not apply to Kiyohara.

Our analysis begins with the clear language of Section 8(g) itself. The Section does not speak of unrepresented individuals nor small groups of unrepresented individuals. It clearly states that "labor organizations" must give the statutory notice. The term "labor organization" is defined elsewhere in the Act to mean:

" . . . any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employees concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." (Section 2(5)) (29 U.S.C. § 152(5)).

Notwithstanding this clear language, the Hospital argues that it was the intent of Congress that all employees, even those without a labor organization, be required to give the 10-day notice. In arriving at this legislative intent, the Hospital relies on a single statement made by Senator Taft during the legislative debates on the subject. During these debates, Senator Taft stated:

"Clearly employees acting without a labor organization or in derogation of a representative would have no greater rights or fewer obligations, for example, under 8(g) than those of a labor organization. It would not be protected activity for employees acting without a labor organization to engage in a work stoppage or picket without giving the required notice."

(120 Cong.Rec. 56,941 (daily ed. May 2, 1974))

The National Labor Relations Board, in *Walker Methodist Residence,* 227 N.L.R.B. No. 238, dealt at length with the same issue of whether the notice provisions of Section 8(g) applied to individual unrepresented employees. In that discussion the Board stated:

"In enacting Section 8(g), Congress did not make a legislative finding of fact that all work stoppages against health care institutions are so harmful that they must be forbidden. Rather, it found that strikes or picketing by labor organizations against health care institutions are so potentially disruptive as to require

that advance notice be given. Nothing in the 1974 Health Care Amendments restricts concerted activity by nonorganized employees, and the legislative history does not indicate an intent to alter the scope of protection granted them under Section 8 . . . . The amendments should therefore not be read to reduce the preexisting rights of health care employees unless explicit language mandates that result."

(footnote omitted)

(227 N.L.R.B. at 1631–1632)

In discussing the legislative history of Section 8(g) in light of the "labor organization" language, the Board stated:

"Section 8(g) appears on its face to apply only to striking or picketing by a labor organization. The Respondent, however, points to the legislative history to support its assertion that the 8(g) notice requirement applies to all strikes at a health care institution. Although there is language in the floor debates to support the Respondent's position [e. g., Senator Taft's statement, supra], a reading of the legislative history as a whole leads to the opposite result. Congress was concerned that sudden, massive strikes could endanger the lives and health of patients in health care institutions. In voicing this concern and in considering the solution being proposed by Section 8(g), the legislators again and again spoke of placing the duty on *labor organizations* [original emphasis] to give notice before striking. *A brief work stoppage by a few unorganized employees simply was not the type of disruption with which Congress was concerned.*

(emphasis added)

(227 N.L.R.B. at 1630–1631)

We agree with this discussion by the Board and conclude that the notice requirement of Section 8(g) should be read in accordance with its clear language. Therefore, we hold that the notice requirement of

1. We note in passing that this holding moots the Hospital's argument that Kiyohara lost her protected employee status pursuant to Section 8(d) by striking within the notice time period.

Section 8(g) only applies to "labor organizations" as defined by the Act and that Kiyohara, an unrepresented employee, was not required to give the Hospital the 10 days' notice before engaging in her work stoppage.[1] *Accord, Long Beach Youth Center,* 230 N.L.R.B. No. 90 (1977).

## TERMINATION FOR CAUSE?

 The Hospital contends that Kiyohara was validly discharged for cause because she violated the two-hour call-in rule when she was intentionally absent from work. On the contrary, the Board found that the primary consideration for Kiyohara's termination was her decision to honor the picket lines and support the strike rather than her violation of the call-in rule.

It is well settled, of course, that the findings of the Board must be upheld if supported by substantial evidence, viewing the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This court cannot displace the Board's choice between two conflicting views, even though this court would have made a different choice had the matter been before it *de novo.* *NLRB v. Ayer Lar Sanitorium,* 436 F.2d 45, 48 (9th Cir. 1970).

From our view of the record as a whole, we find that the Board's finding that Kiyohara was primarily discharged for refusing to cross the picket line is supported by substantial evidence. First is Meheula's offer to Kiyohara to excuse her failure to call in and report if she would report for the remainder of the shift. This willingness to waive the clear violation of the rule indicates that the call-in violation was not the basis for the decision to terminate Kiyohara. Secondly are the two prior violations of the call-in rule which had been excused. These indicate a disparate treatment of an employee when the cause for violating the rule is observance of a picket line rather than a family emergency or problems with a pet.

In this case, it would not be possible to have a loss of status under Section 8(d) unless there has first been a Section 8(g) violation.

Other contentions raised by the Hospital have been studied and found to be without merit.

Accordingly, we deny the petition for review and grant the cross-petition for enforcement of the Board's Decision and Order.