**MONTEFIORE HOSPITAL AND MEDICAL CENTER, Employer-Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Marji Gold and Michael Fisher, Employees-Intervenors.**

Nos. 560, 790, Dockets 79–4156, 79–4184.

United States Court of Appeals, Second Circuit.

Argued Jan. 14, 1980.

Decided April 28, 1980.

---

Jerold D. Jacobson, New York City (David H. Diamond, Fred Kolikoff, Guggenheimer & Untermyer, New York City, of counsel), for employer-petitioner.

Robert Sewell, Atty., N. L. R. B., Washington, D.C. (Norton J. Come, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Assn. Gen. Counsel, James Y. Callear, Atty., N. L. R. B., Washington, D.C., of counsel), for respondent.

Loren Siegel, Brooklyn, N.Y. (Amy Gladstein, Gladstein, Reif & Siegel, Brooklyn, N.Y., of counsel), for employees intervenors.

Proskauer, Rose, Goetz & Mendelsohn, New York City (Howard Lichtenstein, Allan H. Weitzman, James H. Carmichael, New York City, of counsel), for amicus curiae Hospital Association of New York State.

Irwin Geller, New York City, for amicus curiae Committee of Interns and Residents.

Roan & Grossman, Kansas City, Mo. (Clifton L. Elliott, Gina Kaiser, Kansas City, Mo., of counsel), for amicus curiae American Hospital Association.

Before LUMBARD, MANSFIELD and NEWMAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Intervenors Dr. Marji Gold and Dr. Michael Fisher filed an unfair labor practice charge with the National Labor Relations Board (Board) against petitioner Montefiore Hospital and Medical Center (Hospital), alleging that in violation of § 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1),[1] it unlawfully suspended them for strike activity and retaliated against them for filing charges with the Board. The Hospital seeks review of a Board order ruling in favor of Drs. Gold and Fisher on all counts, and the Board cross-petitions for enforcement of its order. We reverse the order in part and grant enforcement in part.

These proceedings arise out of a lawful economic strike, with 10 days' notice, of unionized employees at the Bathgate Avenue Clinic of the Hospital (i. e., service, maintenance, technical and certain professional employees represented by District 1199, National Union of Health and Hospital Employees, AFL–CIO) in July of 1976. Drs. Fisher and Gold, not themselves union members, were part-time "preceptors," who taught and consulted with interns and residents at the Hospital who were engaged in the clinic's program of family practice medicine. They walked out without notice to the Hospital in sympathy with the union strike and joined the union picket line. During the strike, one physician (Dr. John Seed), three nurses and a receptionist remained on duty. The normal complement consisted of 10 to 12 physicians and some 24 to 27 others. The clinic remained open, treating those patients it could and referring elsewhere those whom it could not treat.

While on the picket line, according to the findings of an Administrative Law Judge below, Gold and Fisher approached arriving patients, identified themselves as doctors, told the patients of the strike, and opined that they would receive better medical care if they went to a "full service, non-struck facility." They made no inquiry into the condition or ailments of these patients, nor did they tell them that some services were being offered at the clinic. One woman, a Mrs. Aguilar, who had an appointment with Dr. Seed and proved to be in need of immediate assistance, was told (as she described it) that she "could not be taken care of there." She went elsewhere for treatment.

The strike came to an end on July 17, 1976. After management meetings to review the conduct of Gold and Fisher, they were discharged on July 22 because of their conduct during the strike. The discharges were reviewed by a panel of staff physicians, which recommended that since Gold and Fisher had been disciplined sufficiently by the separation, they be allowed to return to work. Upon receipt of this recommendation Dr. Martin Cherkasky, the President of the Hospital, met with Gold and Fisher on September 8. Receiving their assurances that they would not in the future engage in abandonment of their duties or patients nor in obstructing patients seeking care at the clinic and their concession that those activities may not have been entirely appropriate, he recommended their reinstatement to the Trustees. The two doctors resumed their part-time positions on October 1, 1976.

In late 1976 the Hospital decided to expand its Family Practice Program as of

---

1. Section 8(a)(1) provides:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;"

Section 7 of the Act, 29 U.S.C. § 157, provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

February 1, 1977, creating two full-time faculty positions. Dr. Gold applied for one of those positions. She was recommended for the position by the Director of the Residency Program, whose recommendations were normally accepted. Dr. Fisher applied for the second position and was also recommended. In the meantime, on November 17, 1976, Gold and Fisher filed unfair labor practice charges based on the July discharge, resulting in issuance of the complaint that led to the present proceedings on review. Dr. Cherkasky refused to approve recommendations of them for full-time positions during the pendency of those proceedings. He felt that their filing of charges was inconsistent with the doctors' assurances of September 8, casting doubt on their good faith, and he was concerned about the propriety of their professional conduct during the strike.

In June 1976, prior to the strike, Gold and Fisher sought to convert their temporary privileges regarding admission of patients to Montefiore Hospital to permanent admitting privileges. Although the grant of these privileges was recommended by the head of the Department of Medicine, the Trustees deferred consideration until November 1977 because of their activity during the July 1976 strike.

Based on these findings of fact, Administrative Law Judge Charles W. Schneider held that the doctors violated no duty in striking without notice, supporting the Union's strike and picketing, but that their picket line conduct—specifically, their identifying themselves as doctors and, when prospective patients attempted to enter the clinic, turning them away with the statement they would receive better care at a full-service, non-struck facility—was unprotected. Since one motive for the discharge was lawful and one unlawful, he found the Hospital's discharge of them violated § 8(a)(1). He nevertheless refused to order

back pay for the period of discharge, due to their unprotected strike activity.

The Judge found that the deferral of full-time employment for Gold and Fisher was in retaliation for their filing of unfair labor practice charges, thus violating §§ 8(a)(4)[2] and 8(a)(1) of the Act, 29 U.S.C. § 158(a)(4), (a)(1). He ordered that the doctors be offered full-time positions, with lost wages for the period of delay. He found that the evidence did not support a conclusion that permanent admitting privileges were withheld because of protected activity.

The Board reversed the ALJ's determination that the picket line activity was unprotected, and accordingly ordered back pay for the period of discharge. It also ruled that the evidence showed that the deferral of action on the applications for permanent admitting privileges was in retaliation for protected strike activities, and ordered immediate consideration of those applications. In all other respects it adopted the holdings of the ALJ.

We believe that the original conclusions of the ALJ were correct. We reverse the order of the Board insofar as it departs from his recommendations.

## DISCUSSION

This petition for review presents three legal questions: (1) whether Drs. Gold and Fisher were engaging in protected activity when they went on strike in sympathy with striking hospital employees without giving the Hospital prior notice, (2) whether the two doctors' statements on the picket line to prospective patients were protected, and (3) whether the hospital's temporary discharge of the doctors and its withholding of full-time appointments and permanent admitting privileges from them was permissible.[3]

---

2. Section 8(a)(4) provides:
   "(a) It shall be an unfair labor practice for an employer—
   "(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act."

3. The Hospital did not argue here or before the Board that Drs. Gold and Fisher are supervisors and therefore beyond the protection of the Act. See *NLRB v. New Madrid Mfg. Co.*, 215 F.2d 908, 915 (8th Cir. 1954), indicating that this question as to the jurisdiction of the Board

### 1. *Failure to Give Advance Notice of Strike.*

The Hospital argues that Gold and Fisher were obligated to give advance notice of their intention to strike, and therefore their strike without doing so was unprotected by the Act. Two other doctors who struck after giving notice were not disciplined by the Hospital. The sources of this obligation are said to be, first, § 8(g) of the Act, 29 U.S.C. § 158(g) (which pertains solely to health care employees) and, second, established limitations on the right to strike under the Act.

Section 8(g) of the Act, enacted as part of the 1974 Health Care Amendments to the Act, Pub.L.No.93–360, § 1(e), 88 Stat. 396, states:

> "A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention . . . The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties."

The term "labor organization" is defined in § 2(5) of the Act, 29 U.S.C. § 152(5), to mean:

> "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

In spite of the clear limitation of § 8(g) to labor organizations, and the evident fact that Drs. Gold and Fisher do not fit within the definition of a labor organization, the Hospital argues that § 8(g) applies to the doctors, and that their failure to give notice rendered their strike unprotected by the Act. This interpretation of the statute's language has been rejected by the Board and various courts which have addressed the matter, see *NLRB v. Long Beach Youth Center, Inc.*, 591 F.2d 1276 (9th Cir. 1979); *NLRB v. Rock Hill Convalescent Center*, 585 F.2d 700 (4th Cir. 1978); *Kapiolani Hospital v. NLRB*, 581 F.2d 230 (9th Cir. 1978); *Walker Methodist Residence and Health Care Center, Inc.*, 227 N.L.R.B. 1630 (1977). Although the public's interest in continued health care and elementary principles of decency and professional ethics would warrant such an interpretation of an ambiguous statute, we are here confronted with one whose language is crystal clear. We cannot disregard the "ordinary meaning of plain language," *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978),[4] and accordingly must reject the argument that the statute requires prior notice.

Neither the legislative history nor the purpose of the 1974 Health Care Amendments warrants a contrary conclusion. The Hospital relies on a comment from the floor of the Senate by Senator Taft, one of the authors of the Amendments, stating:

> "Clearly employees acting without a labor organization or in derogation of a representative would have no greater rights or fewer obligations, for example, under 8(g) than those of a labor organization. It would not be protected activity for employees acting without a labor or-

---

to issue its order is therefore not before us. At any rate, the record before us indicates that the part-time duties of these doctors did not make them supervisors under § 2(11) of the Act, 29 U.S.C. § 152(11). See S.Rep.No.766, 93d Cong., 2d Sess. 6, reprinted in 1974 U.S.Code Cong. & Admin.News, pp. 3946, 3951. Their activities primarily involved treating patients and assisting interns and residents, and they appear to have little control over management and personnel decisions (although the record is sparse on this point). Compare *NLRB v. Yesh-*

*iva University*, —— U.S. ——, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980).

4. The Supreme Court has held, in construing the term "employee" under § 2(3) of the Act, that it "is not to be stretched beyond its plain meaning." *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971). We adopt the same approach in construing "labor organization" under § 2(5).

ganization to engage in a work stoppage or picket without giving the required notice." 120 Cong.Rec. 12945 (1974).

If Senator Taft understood § 8(g) to apply to individual employees,[5] there is no indication that any other senators shared this view or that any members of the House of Representatives thought "labor organization" meant "employee." The debates and the committee reports refer repeatedly to "labor organizations." Both sources reflect concern with the disruption of patient care caused by unanticipated *mass* strikes. While the statement of an author of the legislation in question is entitled to some weight, see *United States v. Enmons*, 410 U.S. 396, 404 n.14, 93 S.Ct. 1007, 1011, 35 L.Ed.2d 379 (1973); *National Woodwork Manufacturers Assn. v. NLRB*, 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357 (1967), we reiterate that "a remark made in the course of debate, heard, in all probability, by only a few members of one house, . . . should not overcome clear statutory language." *Foti v. Immigration and Naturalization Service*, 308 F.2d 779, 786–87 (2d Cir. 1962) (en banc), *rev'd*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). The focus of the debates and legislative history was on large-scale activity.[6] We cannot conclude that the legislative history requires us to ignore the unambiguous language of § 8(g).

The purpose of § 8(g) is to give hospitals "sufficient notice of any strike or picketing to allow for appropriate arrangements to be made for the continuance of patient care in the event of a work stoppage." S.Rep.No. 766, *supra*, at 3; 1974 U.S.Code Cong. & Admin.News, p. 3948. When, as in this case, a union has given notice of its intention to strike, the hospital would be well-ad-

vised to inquire of the rest of its employees whether they plan to stay out in sympathy. An employee who strikes after promising to show up may well forfeit protection under the Act. See *Silbaugh v. NLRB*, 429 F.2d 761, 762 (D.C.Cir.1970). Moreover, strikes by hospital employees under certain conditions are not protected by the Act, a point to which we will turn next. However, if prior notice by a doctor before striking is to be mandated, Congressional action is required.

The Hospital also contends that strikes by doctors who have not given advance notice are unprotected under the Act because of the special risks they create. However, the Act protects the right of employees to engage in concerted activities, including the right to strike without prior notice, *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963), and to strike in sympathy with fellow employees. *NLRB v. C.K. Smith & Co.*, 569 F.2d 162, 165 (1st Cir. 1977), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978); *NLRB v. Union Carbide Corp.*, 440 F.2d 54, 55–56 (4th Cir.), *cert. denied*, 404 U.S. 826, 92 S.Ct. 96, 30 L.Ed.2d 55 (1971). Except for the very limited notice requirement expressly provided by § 8(g), prior notice has been judicially mandated only when a strike, by its timing or unexpectedness, creates great danger or is likely to damage the employer's business excessively. See, e. g., *Southern Steamship Co. v. NLRB*, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942); *Dobbs Houses, Inc. v. NLRB*, 325 F.2d 531 (5th Cir. 1963); *NLRB v. Marshall Car Wheel & Foundry Co.*, 218 F.2d 409, 413 (5th Cir. 1955); *NLRB v. Reynolds & Manley Lumber Co.*, 212 F.2d 155 (5th Cir. 1954); *Albrecht v. NLRB*, 181 F.2d 652 (7th

---

**5.** It is possible that Senator Taft was referring to a mass strike by a group of employees only informally joined together. Groups of this sort have been held to come within the definition of a "labor organization." See, e. g., *NLRB v. Kennametal, Inc.*, 182 F.2d 817, 818 (3d Cir. 1950). Drs. Gold and Fisher, in the present case, were not a labor organization regardless of what definition we choose. Even if we were to assimilate them for purposes of the definition into the union with whose strike they sym-

pathized, there would be no violation of § 8(g) since that union gave the required notice before striking.

**6.** For instance, the Senate Committee noted that employers could not bring in "large numbers of supervisory help, nurses, staff and other personnel from other facilities for replacement purposes." S.Rep.No.766, 93d Cong., 2d Sess. 4, reprinted in 1974 U.S.Code Cong. & Admin. News, p. 3950.

Cir. 1950). Otherwise, in view of the substantial protection which the labor laws accord the right to strike for legitimate work-related goals, the protection of the Act will not be withdrawn wholesale by the courts. Our practice is to review each case individually. See, e. g., *NLRB v. A. Lasaponara & Sons, Inc.*, 541 F.2d 992, 998 (2d Cir. 1976), *cert. denied*, 430 U.S. 914, 97 S.Ct. 1325, 51 L.Ed.2d 592 (1977).

In this case, although prior notice by Drs. Gold and Fisher would have been more considerate and in keeping with their ethical duties to the Hospital and their patients, we cannot say that their failure to give it created such danger or risk of harm to patients as to justify depriving them of the Act's protection. This was not a case in which patients were left lying on the operating table, emergency room personnel walked off, or people in need of immediate treatment were left to fend for themselves. These doctors had their primary duties in a teaching and consultative capacity. While they did have responsibilities directly affecting patients, there is no evidence that they put any patients at risk by their unexpected departure. Under the circumstances, they retain protection under §§ 7 and 8(a)(1) of the Act.

Moreover, if we adopted the Hospital's position that any strike without notice by a doctor is unprotected, we would in effect be rewriting § 8(g) in the very manner we have concluded that Congress did not intend. Congress imposed a notice requirement on strikes of hospitals by labor organizations on the understanding that no such requirement existed under current law. See S.Rep.No.766, 93d Cong., 2d Sess. 4, reprinted in 1974 U.S.Code Cong. & Admin. News, p. 3949. Had it wished to impose such a rule on all hospital employees, it could have done so.

We do not condone these doctors' decision to strike against a hospital employer without notice. Cooperation between a hospital and its professional staff is essential to the reliable and efficient provision of health care. Failure to give notice before striking is a breach of this cooperation, and raises ethical questions. See American Medical Ass'n, Principles of Medical Ethics § 5;

Principles of Professional Conduct of the Medical Society of the State of New York, ch. 2, § 4 (1975). We hold only that a doctor does not lose the protection of the labor laws by striking without advance notice, absent circumstances of endangerment. This protection might well have been lost if the doctors had a contractual agreement not to strike without notice, or if they had told the Hospital, in response to a survey of employees when the union announced its intention to strike, that they would not strike. A hospital which receives notice pursuant to § 8(g) before its unionized employees go on strike might find it advantageous to undertake such a survey of the rest of its employees.

We therefore conclude that Drs. Gold and Fisher did not lose the protection of the Act when they went on strike in sympathy with union employees without giving advance notice.

### 2. *Picket Line Misconduct.*

The Hospital contends that the comments made by Drs. Gold and Fisher on the picket line constituted unprotected activity in that they gave medical advice solely designed to direct patients away from the struck facility and they improperly used their status as physicians for that purpose. The ALJ agreed with this contention. The Board reversed. It concluded that the doctors' statements did not constitute medical advice because the doctors made no effort to diagnose any patient's condition, and that the comments were protected appeals to would-be "customers" at the primary site not to avail themselves of the services of the struck facility. We do not agree.

While picketing and appealing to potential customers to take their business elsewhere in support of a legal strike is accorded considerable protection by the labor laws, *United Steelworkers of America v. NLRB*, 376 U.S. 492, 499, 84 S.Ct. 899, 904, 11 L.Ed.2d 863 (1964); *NLRB v. Visceglia*, 498 F.2d 43, 48 (3d Cir. 1974), certain types of misconduct will render this activity unprotected, e. g., serious violence, *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 252, 59 S.Ct. 490, 494, 83 L.Ed. 627 (1939); *Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d

320, 329 (7th Cir. 1976), deliberate or reckless falsehoods, *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 61, 63, 86 S.Ct. 657, 662, 663, 15 L.Ed.2d 582 (1966); *NLRB v. Cement Transport, Inc.*, 490 F.2d 1024, 1029–30 (6th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974), or disparagement of the employer's product or services, *NLRB v. Local Union No. 1229, IBEW (Jefferson Standard Broadcasting Co.)*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953); *Patterson-Sargent Co.*, 115 N.L.R.B. 1627 (1956).

▆▆▆ Underlying these cases is the principle that while legally striking employees are generally entitled to enlist the consensual support of the public for their cause, they may not elicit that support by force, trickery or guile, nor may they deliberately inflict on the employer economic harm unnecessary to the legitimate concerted activities. See *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962); *NLRB v. A. Lasaponara & Sons, Inc.*, supra, 541 F.2d at 998. In judging picket line activity, like other activity in labor disputes, we grant employees some leeway since passions may run high and impulsive behavior is common. *American Telephone & Telegraph Co. v. NLRB*, 521 F.2d 1159, 1161 (2d Cir. 1975); *Robertshaw Controls Co. v. NLRB*, 483 F.2d 762, 765 (4th Cir. 1973); *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965).

▆▆▆ Turning to the facts of this case, we believe that the efforts of Drs. Gold and Fisher to discourage patients from entering the clinic exceeded the bounds of the Act's protection. While their comments did relate to the labor dispute, see *NLRB v. Owners Maintenance Corp.*, 581 F.2d 44, 49 (2d Cir. 1978), they achieved the desired result by leading patients to fear that they would receive inadequate medical care if they dared to enter the clinic. They appealed to patients to turn away not out of sympathy with the aims of the striking workers (although some may have left for this reason), but in the belief that they could not obtain competent treatment there. This impression was conveyed by the doctors in reckless disregard of its truth or falsity, compare *Community Hospital of Roanoke Valley, Inc. v. NLRB*, 538 F.2d 607 (4th Cir. 1976), because some of the patients could in fact be treated there, and those who could not would be examined by Dr. Seed and referred to other hospitals if necessary.[7] The statements of the doctors were calculated and quite effective, taking full advantage of the authority conveyed by their status as doctors.

The doctors, by their misconduct, went beyond the limits of fair persuasion and honest appeals to the public. Their comments were deceptive and aimed at evoking a submissive, unreasoned, misinformed reaction from those whose cooperation they sought. By their conduct on the picket line, the doctors therefore lost the Act's protection of their otherwise legitimate concerted activity.

### 3. *Action Taken by Hospital.*

▆▆▆ Following an investigation into the conduct of Drs. Gold and Fisher during and immediately after the strike, with an opportunity extended to both to be heard and to explain their actions, the Hospital found that they had failed to fulfill their professional and employment obligations, had obstructed patients seeking medical care and had disparaged the medical services available at the Bathgate clinic during the strike. Accordingly, on July 22, 1976, they were discharged. On September 8, 1976, they were re-employed upon their express assurances to the Hospital that they would not

---

7. Some concept of the aggravated nature of the misconduct of Drs. Gold and Fisher can be gathered from one episode. When a patient of Dr. Seed named Virginia Aguilar, who was suffering from diabetes, fever and infection with an abscess upon which Dr. Seed was to operate that day, attempted to enter the clinic pursuant to appointment, she was stopped by Dr. Gold who identified herself as a physician. Despite Ms. Aguilar's explanation of the serious nature of her malady and her appointment, Dr. Gold told her there were no doctors or pharmacists inside, and that she would have to go elsewhere because she "could not be taken care of" at the clinic. Luckily Ms. Aguilar was operated on later that day at the Hospital's main facility, some distance away.

again abandon their patients and professional duties or obstruct patients from receiving medical care at the clinic.

The ALJ concluded that the discharges, to the extent that they were based upon the doctors' unprotected misconduct, did not violate the Act and that, although the existence, in addition, of an unlawful motive (failure to give notice before striking) tainted the legality of the discharges, back pay awards for the period of the discharges were inappropriate, since the effect might be to condone or encourage unprotected activity. With this recommendation we fully agree. The grossly improper picket line conduct of Drs. Gold and Fisher would have fully justified their being permanently discharged. Accordingly we reverse the Board's award of back pay for the period of the discharges.

The ALJ also concluded that the evidence would not support a finding that the Hospital held off granting permanent admitting privileges to Drs. Gold and Fisher in retaliation for protected activity, but that the grant of full-time positions had been deferred in response to the protected filing of an unfair labor practice charge. The Board rejected the first holding, concluding that permanent admitting privileges had been delayed in response to protected strike activity. It agreed that the full-time positions had been improperly denied.

Turning to the delay in granting permanent admitting privileges, we reverse the holding of the Board. The evidence accepted by the Board indicated that permanent privileges were delayed not because of the filing of charges but because of the strike activity itself. Indeed, the evidence does not indicate that privileges were delayed on account of the charges, because at the time charges were filed (in November 1976), the Hospital's medical board had already delayed its decision on the applications (made in June 1976) far beyond the usual 90-day period. There is, however, substantial evidence to support the Board's finding that the privileges were delayed because of the strike activity. Since we have held that part of that activity was unprotected, this response by the Hospital did not violate the labor laws and is not appropriately the sub-

ject of a remedial order. We therefore reverse and deny enforcement of that portion of the Board's order mandating immediate action on the applications for permanent admitting privileges.

■ We agree with the Board that the Hospital violated §§ 8(a)(4) and (1) of the Act, 29 U.S.C. §§ 158(a)(4), (1), by denying the doctors full-time positions in retaliation for their filing of charges. The Supreme Court has articulated the policies involved:

"Implementation of the Act is dependent upon the initiative of individual persons who must, as petitioner has done here, invoke its sanctions through filing an unfair labor practice charge. Congress has made it clear that it wishes all persons with information about such practices to be completely free from coercion against reporting them to the Board. This is shown by its adoption of § 8(a)(4) which makes it an unfair labor practice for an employer to discriminate against an employee because he has filed charges. . . . And it has been held that it is unlawful for an employer to seek to restrain an employee in the exercise of his right to file charges." *Nash v. Florida Industrial Commission*, 389 U.S. 235, 238, 88 S.Ct. 362, 365–366, 19 L.Ed.2d 438 (1967).

See also *NLRB v. Scrivener*, 405 U.S. 117, 121–22, 92 S.Ct. 798, 801, 31 L.Ed.2d 79 (1972). The courts take a "liberal" approach "in order fully to effectuate the section's remedial purpose." *Id.* at 124, 92 S.Ct. at 803.

Had the Hospital refused to reemploy the doctors or to grant them full-time positions because of their unprotected strike activity, there would be no violation of the Act. Here, however, the Hospital restored them to their positions. As employees they were entitled to all rights extended to employees by the Act, including the rights guaranteed by §§ 8(a)(4) and (1). The Board, with substantial evidence to support it, found that it was the filing of charges which led to the denial of the positions, and that those positions would otherwise have been granted in spite of the strike activity.

■ As this Court and others have held, employers may not rely on the pendency of

Board proceedings to delay or deny hiring, promotion or other benefits to employees. *NLRB v. Syracuse Stamping Co.*, 208 F.2d 77, 80 (2d Cir. 1953); *NLRB v. Globe Mfg. Co.*, 580 F.2d 18, 20 (1st Cir. 1978). Allowing the employer to drag its feet would "leave the employee in limbo indefinitely and would discourage recourse to the remedies of the National Labor Relations Act." *Id.* The Hospital's legal position would in no way have been jeopardized by granting the full-time positions, since it could still contend that it had previously discharged them solely because of their unprotected activity.

Dr. Cherkasky indicated that he held up the appointments because he viewed the filing of charges as inconsistent with the assurances previously given by the doctors that they would not repeat their conduct. His inference of bad faith, however, is not necessarily a reasonable one, since the doctors have not repeated their improper, unprotected conduct and may not intend to do so. We will not readily permit inferences adverse to employees to be drawn from the fact that they have filed unfair labor practice charges, since that would undoubtedly discourage resort to the Board's remedies, contrary to the intent of Congress. We thus conclude that the Hospital acted unlawfully by denying Gold and Fisher full-time positions because they had filed unfair labor practice charges with the Board.[8]

4. *Summary.*

We have concluded that Drs. Gold and Fisher engaged in protected activity when they went on strike in sympathy with union employees without giving prior notice to the Hospital. They lost their protection when they discouraged patients from entering the clinic by telling them, in reckless disregard of the truth or falsity of their statements, that they could not be taken

care of there. Thus, the ALJ properly denied back pay for the period during which the doctors were discharged for their activity, and the Board was in error in granting back pay for that period. The Board was also in error when it ordered immediate action on the doctors' applications for permanent admitting privileges, since the delay was in response to unprotected activity. The Board properly ordered that the doctors be offered the full-time positions of which they were deprived in retaliation for filing unfair labor practice charges, and that the Hospital make the doctors whole for any wages they lost due to this improper delay.

The order of the Board is reversed in part and enforced in part, in accordance with the foregoing.

---

**8.** The Hospital contends that the Board erred when it added the § 8(a)(4) claim (based on denial of full-time positions in retaliation for the filing of charges) more than six months after the conduct occurred, violating the statute of limitations of § 10(b) of the Act, 29 U.S.C. § 160(b). This claim is meritless. The § 8(a)(4)

charge was closely related to the charges already preferred, entitling the Board to expand its inquiry to include it. *NLRB v. Jack La-Lanne Mgmt. Corp.*, 539 F.2d 292, 294–95 (2d Cir. 1976); *NLRB v. Dinion Coil Co.*, 201 F.2d 484, 491 (2d Cir. 1952).