**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SEIU, UNITED HEALTHCARE
WORKERS-WEST,
                    *Petitioner,*

v.

NATIONAL LABOR RELATIONS
BOARD,
                    *Respondent,*

CALIFORNIA PACIFIC MEDICAL
CENTER,
                    *Intervenor.*

No. 07-73028

NLRB No.
20-CG-65

NATIONAL LABOR RELATIONS
BOARD,
                    *Petitioner,*

CALIFORNIA PACIFIC MEDICAL
CENTER,
                    *Intervenor,*

v.

SEIU, UNITED HEALTHCARE
WORKERS-WEST,
                    *Respondent.*

No. 07-73673

NLRB No.
20-CG65

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
February 13, 2009—San Francisco, California

Filed August 3, 2009

10089

Before: Alfred T. Goodwin, Mary M. Schroeder and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Schroeder

## COUNSEL

David Rosenfeld, Alameda, California, for the petitioner-respondent.

Julie Broido, Washington, DC, for the respondent-petitioner.

Christopher Scanlan, San Francisco, California, for the intervenor.

## OPINION

SCHROEDER, Circuit Judge:

This union petition for review and National Labor Relations Board ("NLRB") cross-petition for enforcement concern

Section 8(g) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(g). Section 8(g) applies only to hospitals and requires a union to give ten days' notice before beginning any "concerted refusal to work." In this case, Service Employees International Union, United Healthcare Workers-West ("the Union") gave only four days' notice before its members collectively declined to work overtime, as the Union had urged them to do. The Union nevertheless contends it was relieved of the ten-day statutory notice requirement because its collective bargaining agreement with the hospital provided that the hospital could not force an individual employee to work overtime.

Over a dissent, the NLRB held that an individual's exercise of the right to decline particular overtime work is not the same as a collective refusal to do any overtime work, and that the Union violated the statutory ten-day notice requirement. "The *Chevron* doctrine requires that this court defer to the NLRB's interpretation of the NLRA if its interpretation is rational and consistent with the statute." *UFCW, Local 1036 v. NLRB*, 307 F.3d 760, 766 (9th Cir. 2002). The NLRB's interpretation is entitled to deference, and we affirm its order.

## BACKGROUND

The Union represents a bargaining unit of housekeepers and linen aides employed by California Pacific Medical Center ("the Hospital"). The employees are in the Environmental Services departments of the Hospital's Davies and Pacific campuses. In a series of collective bargaining agreements ("CBA") negotiated over the years, the parties have agreed that the Hospital cannot assign mandatory overtime, except during emergencies. The relevant CBA's overtime provision was as follows:

> The Medical Center shall not assign overtime unless one of the following conditions exist: there is a disaster or emergency declared by a federal, state,

and/or local agency or a member of the Medical Center's Senior Management team has determined that an emergency exists. For the purpose of this section, emergency is defined as an unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate action. Prior to assigning mandatory overtime, the Medical Center will first seek volunteers for additional work. In situations where mandatory overtime is to occur, the Medical Center will give advance notice, as permitted by operational circumstances, to the employee(s) who will be mandated to stay.

Because the Hospital does require significant numbers of overtime shifts to meet its staffing requirements, the Hospital relies on employees in the units being willing to volunteer. The Hospital was always able to secure sufficient volunteers before May 2006. The Davies campus typically required sixteen hours of overtime during each day shift and twenty-four hours of overtime during each evening shift, from Friday to Monday. Overtime needs during the weekdays, Tuesday to Thursday, were less regular. The Pacific campus required up to eight full overtime shifts each day.

In May 2006, the Hospital proposed to change its methods of processing linens in a manner that the Union contended violated the provision in the CBA prohibiting subcontracting of employee work. In a petition signed by more than 100 employees, and presented to the managers at the Davies and Pacific campuses, the Union protested the proposal and called for a one week long refusal to do overtime work:

We the undersigned [Union] members in Environmental Services hereby protest the proposal of [Hospital] management to sub-contract our work in the linen room out to the West Bay Distribution center. This is a direct violation of the no sub-contracting clause of our contract. By signing this petition we

hereby authorize our shop stewards to call for rolling one week, no overtime no extra shift policy amongst [Union] members in the Environmental Service department on an as needed basis. We commit to one-another that we will honor this commitment to action and stand strong in our *fight* with [the Hospital] to force them to respect and honor our contract.

The petition was circulated to the manager of the Davies campus on June 1, 2006, and to the manager of the Pacific campus on June 2, 2006. This was the first notice the Hospital had of a possible cessation of work.

On Monday, June 5, four days after receiving the Union's petition, the manager of the Davies campus sought to fill 16 hours of overtime, but could not find a single volunteer from the seven employees she called out of the ten employees who were eligible. She again called several employees each day from Tuesday, June 6 through Thursday, June 8, but all refused. The manager of the Pacific campus called approximately ninety eligible employees on Monday, June 5, and could not get a volunteer. He was also unable to fill overtime slots on June 6 or June 7. The refusals ceased on Monday, June 12, when employees at both campuses began accepting overtime.

The Union supported and advertised the refusals to perform overtime. The Union's newsletter, published during the week of the refusals, described the action as follows:

EVS workers at all three [Hospital] campuses are standing up to management's attempt to subcontract the jobs of our coworkers in the Linen Room. Last week a super majority of [Union] members . . . signed a petition demanding [the Hospital] respect our contract and halt its plans to subcontract the Linen Room . . . . In addition, the petition called for one week of no overtime, no extra shifts for [Union]

members in the EVS department. Starting on June 5th, the no overtime, no extra shift policy has exposed the short staffing that management has created in the EVS department. It is now crystal clear that [the Hospital] needs to hire more EVS staff, not eliminate jobs.

In response, management has attempted to force [Union] members to do extra work to cover the shifts management has failed to fill. . . . [O]ur contract clearly prohibits this unless there is an emergency situation . . . . If management attempts to force you to do extra work during your shift contact your steward immediately!

The Hospital filed unfair labor practice charges on June 13, 2006, claiming that the Union violated Section 8(g) by failing to provide timely notice of its intention to engage in a concerted refusal to work. The ALJ issued a decision finding a violation of Section 8(g) and recommended that the NLRB issue an order requiring the Union to cease and desist from any concerted refusals to work overtime. The order provided:

Cease and desist from engaging in any strike, picketing, or other concerted refusal to work; including a concerted refusal to volunteer for overtime work, at the premises of [the Hospital], or any other health care institution, without timely notifying, in writing, any such health care institution and the Federal Mediation and Conciliation Service, not less than 10 days prior to such action, of that intention.

On July 27, 2007, the NLRB, over the dissent of one member, affirmed the ALJ's findings of fact and conclusions of law and entered the order the Board now seeks to enforce. *See SEIU United Healthcare Workers-West*, 350 N.L.R.B. 284, 286 (2007).

## ANALYSIS

**[1]** Section 8(g) of the NLRA was enacted as part of a series of statutory provisions intended to respond to special issues raised by labor organizations in a hospital setting. Other relevant NLRA provisions enacted at the same time included the elimination of an exception for hospitals from the statutory definition of "employer," 29 U.S.C. § 152(2), and the addition of special collective bargaining provisions for employees of health care institutions, *id.* § 158(d). Section 8(g) of the NLRA provides, in relevant part, as follows:

> A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention . . . . The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

29 U.S.C. § 158(g). When Congress enacted Section 8(g) in 1974, its stated goal was to balance two dominant considerations: the desire to bring employees of non-profit hospitals within the protection of the Act, and the need to protect the public interest by "insur[ing] the continuity of health care to the community and the care and well being of patients by providing for a statutory advance notice of any anticipated strike or picketing." *Kapiolani Hosp. v. NLRB*, 581 F.2d 230, 233 (9th Cir. 1978) (quoting Senate Comm. on Labor and Public Welfare, S. Rep. 93-766, at 3 (1974)*, reprinted in* 1974 U.S.C.C.A.N. 3946, 3949). The ten-day notice requirement was intended to prevent disruption of patient care by giving hospitals time to plan ahead for strikes, pickets, or other work stoppages. *See NLRB v. Stationary Eng'rs, Local 39*, 746 F.2d 530, 533 (9th Cir. 1984).

**[2]** In this case, the parties' CBA prohibits the Hospital from assigning mandatory overtime to Union employees, except during emergencies. The most obvious reason for inclusion of this provision was to give individual employees flexibility in choosing to accept or reject the Hospital's offers of overtime shifts, but it did not specifically waive the Hospital's right to ten days' notice of collective refusals to work.

**[3]** We owe the NLRB great deference in its interpretation of the NLRA, *NLRB v. Calkins*, 187 F.3d 1080, 1085 (9th Cir. 1999), and will not overturn the agency unless "there are compelling indications that it is wrong," *Stationary Eng'rs*, 746 F.2d at 532 (citation omitted). The Board majority held that the Union's actions amounted to a "concerted refusal to work" within the meaning of Section 8(g), and that the Union therefore violated the statute by failing to give the required ten days' notice of its planned work stoppage. The Board reasoned that the work stoppage in this case was subject to Section 8(g) because it was orchestrated by the Union as a collective means of accomplishing a common goal: pressuring the Hospital to change a policy the Union perceived as being unfavorable to its members. The Board noted that its decision furthered the public protection purpose underlying Section 8(g)'s notice requirement.

**[4]** The Union's principal argument, one supported by the dissenting Board member, is that the collective refusal to work overtime is authorized by the CBA provision stating that the employer cannot force an individual to work overtime. The Union contends that because the employer has agreed that each employee can decline to perform overtime on an individual basis, the Union can, in accordance with the contract, direct its members to decline to perform work on a collective basis without engaging in any "refusal" to work within the meaning of Section 8(g). We agree with the Union that there would not necessarily be a concerted refusal to work in the event all employees, acting independently, were unwilling to volunteer for overtime. Here, however, the members did

not act on an individual basis. Rather, their action was "concerted" because it was orchestrated by the Union. The NLRB appropriately ruled that the employees' decisions were "concerted" under Section 8(g).

[5] The leading NLRB decision interpreting Section 8(g) is *N.Y. State Nurses Ass'n* (*Mt. Sinai Hosp.*), 334 N.L.R.B. 798 (2001). *Mt. Sinai Hospital* held that a union was required to give ten days' notice under circumstances remarkably similar to those before us now. In that case, the union requested that nurses refuse to volunteer for overtime and refuse to perform overtime assigned to them, calling upon them to exercise contractual rights to refuse to volunteer. The Board held that the Union called for a "concerted refusal to work," requiring ten days' notice:

> To be sure, Section 8(g) does not prevent employees from exercising their rights under the collective-bargaining agreement. It does, however, in the absence of the required written 10-day notice, prohibit a union from inducing employees to exercise their contractual rights as part of the union's effort to pressure an employer to change terms and conditions of employment. If the union is going to call for a strike or concerted refusal to work, the employer is entitled to the appropriate statutory notice.

*Id.* at 801.

[6] The Union, citing the dissent in *Mt. Sinai Hospital*, 334 N.L.R.B. at 804 (Liebman, dissenting), argues that an employee's decision to decline overtime should only be considered a "refusal to work" when the overtime is mandatory. We need not decide whether such an interpretation of the phrase would also be permissible, were the Board to advance it, because we defer to the broader interpretation actually adopted by the Board, which is both "rational and consistent with the statute." *UFCW*, 307 F.3d at 766.

**[7]** In this case, the Union itself called for the overtime work stoppage. It did not even purport to invoke the provision of the contract allowing for overtime refusal on an individual basis. Under the NLRB's precedent interpreting the phrase, this was a "concerted refusal to work" for which Section 8(g) requires notice.

Our court, interpreting Section 8(g), has stressed the provision's applicability to concerted action. *See Kapiolani Hosp.*, 581 F.2d at 234. In that case, an employer fired an employee who was not a member of the union, but who had individually decided that she would not cross the union's picket line. We enforced the Board's order finding the employer guilty of an unfair labor practice. We held that the unrepresented employee was not required to give the employer notice of her refusal because the statute applies only to concerted refusals to work and requires only unions to give the ten days' notice. *Id.*

**[8]** That holding supports the result in this case. Although the individual decision to refuse to cross the picket line, or in this case to refuse overtime, does not require notice because of the absence of union action, notice is required when a refusal to work is the direct result of union action against a healthcare institution. Other circuits have reached similar conclusions. *See, e.g.*, *Bry-Fern Care Ctr., Inc. v. NLRB*, 21 F.3d 706, 711 (6th Cir. 1994); *NLRB v. Wash. Heights-West Harlem-Inwood Mental Health Council, Inc.*, 897 F.2d 1238, 1246 (2d Cir. 1990); *E. Chicago Rehab. Ctr., Inc. v. NLRB*, 710 F.2d 397, 402-03 (7th Cir. 1983).

**[9]** The Union's secondary argument fares no better. The Union contends that under *Alexandria Clinic, P.A.*, 339 N.L.R.B. 1262, 1263-65 (2003), *enforced by* 406 F.3d 1020 (8th Cir. 2005), it cannot give effective notice of a concerted refusal to work without knowing, at the time it gives the notice, whether the Hospital will need overtime on a specified date ten days in the future. In *Alexandria Clinic*, however, the

union itself chose to delay commencement of its work stoppage beyond the date initially specified in the notice. The NLRB held that this rendered the union's original notice defective and that the union should have issued a new, corrected notice and waited an additional ten days so that the hospital could appropriately prepare. Here, if the Union had given notice ten days in advance of the date when employees planned to begin declining offered overtime, and had followed through on that plan, the notice would not have been rendered defective no matter how the Hospital reacted, even if the Hospital decided not to offer overtime on the specified date. Despite any uncertainty surrounding the Hospital's future decision, the Union was able to give effective notice of the day on which it planned for employees to commence refusing any overtime that might be offered. The NLRB's conclusion that the Union's failure to do so violated Section 8(g) was "rational and consistent with the statute," *UFCW*, 307 F.3d at 766, and its purpose of ensuring uninterrupted patient care in spite of upcoming work disruptions. *See Kapiolani Hosp.*, 581 F.2d at 233.

Petition for Enforcement GRANTED; Cross-Petition for Review DENIED.