**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IDAHO BUILDING AND
CONSTRUCTION TRADES COUNCIL,
AFL-CIO; SOUTHWEST IDAHO
BUILDINGS AND CONSTRUCTION
TRADES COUNCIL, AFL-CIO,
            *Plaintiffs-Appellees*,

v.

INLAND PACIFIC CHAPTER OF
ASSOCIATED BUILDERS AND
CONTRACTORS, INC.,
        *Applicant-in-Intervention–*
                *Appellant*,

v.

LAWRENCE G. WASDEN, in his
official capacity as Attorney General
of the State of Idaho; TIM MASON, in
his official capacity as Administrator
of the Division of Public Works,
            *Defendants-Appellees*.

No. 11-35985

D.C. No.
1:11-cv-00253-
BLW

| | |
|---|---|
| IDAHO BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL-CIO; SOUTHWEST IDAHO BUILDINGS AND CONSTRUCTION TRADES COUNCIL, AFL-CIO, *Plaintiffs-Appellees*, | No. 12-35051 D.C. No. 1:11-cv-00253-BLW |
| v. | OPINION |
| LAWRENCE G. WASDEN, in his official capacity as Attorney General of the State of Idaho; TIM MASON, in his official capacity as Administrator of the Division of Public Works, *Defendants-Appellants*. | |

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued  May 6, 2013
Submitted September 16, 2015
Portland, Oregon

Filed September 16, 2015

Before: Stephen Reinhardt, Marsha S. Berzon,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Berzon

## SUMMARY[*]

### Labor Law

Affirming in part and vacating in part the district court's summary judgment, the panel held that Idaho's "Fairness in Contracting Act" was preempted by the National Labor Relations Act.

The Idaho Act banned "job targeting" or "market recovery" programs under which construction unions collect funds from workers they represent and use those funds to subsidize bids by union contractors. Deferring to the interpretation of the National Labor Relations Board, the panel concluded that it was well settled that most of the conduct prohibited by the Act was protected by the NLRA, and thus that *Garmon* preemption applied. The panel held that the Act's prohibition against the use of job targeting funds derived in part from wages earned on federal projects governed by the Davis-Bacon Act was likely preempted by Davis-Bacon itself. In addition, decisions of the NLRB made clear that the distribution of funds derived in part from Davis-Bacon wages was at least arguably protected by the NLRA, and so preempted under *Garmon*.

Concurring, Judge Berzon wrote that, as explained in the main opinion, the Idaho Act was not saved from NLRA preemption by the line of precedent holding that collection of

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Davis-Bacon wages for job targeting programs violates the Davis-Bacon Act. Judge Berzon wrote that those cases, and in particular *Int'l Bhd. of Elec. Workers, Local 357, AFL-CIO v. Brock*, 68 F.3d 1194 (9th Cir. 1995), were, in her view, wrongly decided.

**COUNSEL**

Judd H. Lees (argued), Williams, Kastner & Gibbs PLLC, Seattle, Washington, for Applicant-in-Intervention–Appellant.

James M. Piotrowski (argued), Alan Herzfled, and Marty Durand, Herzfeld & Piotrowski LLP, Boise, Idaho; Terry R. Yelling, Victoria L. Bor, and Esmerelda Aguilar, Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Washington, D.C., for Plaintiffs-Appellees.

Clay R. Smith, Deputy Attorney General (argued), Steven L. Olsen, Chief of Civil Litigation, Brian P. Kane, Assistant Chief Deputy Attorney General, and Lawrence G. Wasden, Attorney General, Boise, Idaho, for Defendants-Appellants/Defendants-Appellees.

Judd H. Lees (argued), Williams, Kastner & Gibbs PLLC, Seattle, Washington; Maurice Baskin, Venable LLP, Washington, D.C., for Amici Curiae Associated Builders and Contractors, Inc. and Inland Pacific Chapter of the Associated Builders and Contractors, Inc.

William L. Messenger, National Right to Work Legal
Defense Foundation, Springfield, Virginia, for Amicus Curiae
National Right to Work Legal Defense Foundation.

**OPINION**

BERZON, Circuit Judge:

Idaho has banned "job targeting" or "market recovery"
programs. Construction unions have developed such
programs to increase their members' access to work and stem
the long-term decline in the percentage of construction
workers represented by unions. Under such programs, a
union collects funds from workers it represents and then uses
those funds to subsidize bids by union contractors, allowing
the contractors to lower their labor costs and so more
effectively compete with non-union contractors. The
plaintiffs, two Idaho unions, brought suit to enjoin the statute
as preempted by the National Labor Relations Act ("NLRA"),
29 U.S.C. § 151 *et seq*. The district court preliminarily
enjoined Idaho's statute and then granted summary judgment
to the unions.

It is well settled that most of the conduct prohibited by
Idaho's statute is protected by the NLRA. As to the balance
of the prohibited conduct — namely, the use of job targeting
funds derived in part from wages earned on federal projects
governed by the Davis-Bacon Act, 40 U.S.C. § 3141 *et seq*.
— Idaho's proposed enforcement of federal rules governing
wages on federal projects, including criminal penalties more
onerous than the federal statute's own civil and

administrative enforcement provisions, is likely preempted by Davis-Bacon itself.   In any event, the decisions of the National Labor Relations Board (the "NLRB" or "Board") make clear that the distribution of funds derived in part from Davis-Bacon wages is at least arguably protected by the NLRA, and so preempted under one strain of NLRA preemption law.  We therefore affirm in relevant part.

I.

The Idaho "Fairness in Contracting Act" ("the Act") provides in relevant part that:

> (2) No contractor or subcontractor may directly or indirectly receive a wage subsidy, bid supplement or rebate on behalf of its employees, or provide the same to its employees, the source of which is wages, dues or assessments collected by or on behalf of any labor organization(s), whether or not labeled as dues or assessments.

> (3) No labor organization may directly or indirectly pay a wage subsidy or wage rebate to its members in order to directly or indirectly subsidize a contractor or subcontractor, the source of which is wages, dues or assessments collected by or on behalf of its members, whether or not labeled as dues or assessments.

    (4) It is illegal to use any fund financed by wages collected by or on behalf of any labor organization(s), whether or not labeled as dues or assessments, to subsidize a contractor or subcontractor doing business in the state of Idaho.

Idaho Code § 44-2012(2)–(4).  A violation of the Act is a misdemeanor punishable by a fine of up to $10,000 for a first violation, $25,000 for a second violation, and $100,000 for each additional violation.  *Id.* § 44-2012(5).  The Act also establishes a private cause of action available to a range of parties, including any interested taxpayer, to civilly enforce the Act.  *Id.* § 44-2012(6).

    The Act prohibits "job targeting" programs, also known as "market recovery" programs.  Unions have developed such programs in the face of the dwindling share of the construction market held by union contractors and the associated decline in union membership in the construction industry.  The programs' goal is to increase their members' access to employment and spread the benefits of collectively-bargained wages.  *See generally*, Herbert R. Northrup & Augustus T. White, *Subsidizing Contractors to Gain Employment:  Construction  Union  "Job  Targeting"*, 17 Berkeley J. Emp. & Lab. L. 62 (1996).

    The essentials of such job targeting programs are straightforward.  A union collects funds from workers, generally a percentage of their wages, and then uses that money to subsidize a union contractor's payment of wages at the collectively bargained rate on a project which the union

has "targeted." So, for example, a union might agree that a union-affiliated contractor may submit a bid based on a $15/hour pay rate to compete successfully against non-union contractors on that particular project. If the contractor's bid is accepted, then the union will pay the difference between the agreed-on rate and the normal union wage; in this example, if the normal wage is $20/hour, the union would pay $5/hour out of its job targeting fund. The result is that the union-affiliated contractor is able to bid successfully on a project that would otherwise go to a non-union contractor; union members accordingly have access to the jobs on that project, which would otherwise go to employees of non-union companies; and the members working on those jobs are paid the ordinary union rate, rather than the lower wage on which the contractor based his bid.

The mechanics of job targeting programs vary, both in how the funds are collected and how they are distributed. Funds are typically collected by the contractor through a mandatory or voluntary deduction from workers' wages and then deposited into a special job targeting fund controlled by the union. *See J.A. Croson Co.*, 359 N.L.R.B. No. 2, 2012 WL 5246914 (2012); *Int'l Bhd. of Elec. Workers, Local 48*, 332 N.L.R.B. 1492 (2000), *modified* 333 N.L.R.B. No. 122, *enforced*, 345 F.3d 1049 (9th Cir. 2003) ("*Kingston Constructors*"). In some cases, however, workers pay the funds directly to the union. *See Int'l Bhd. of Elec. Workers, Local 357 v. Brock*, 68 F.3d 1194, 1201–02 (9th Cir. 1995). As to distribution, the subsidy may be paid to the contractor, with the contractor paying the worker the full union wage; or the subsidy may be paid directly to the worker, with the

contractor paying less than the ordinary union wage, and the union's payment making up the balance.[1]

## II.

Before the Act went into effect, The Idaho Building and Construction Trades Council, AFL-CIO, and Southwest Idaho Building and Construction Trades Council, AFL-CIO (collectively, the "Trades Councils"), brought this facial challenge against the Attorney General of Idaho to enjoin its enforcement.[2]   The district court granted a preliminary injunction against the enforcement of the Act.  The parties then filed cross-motions for summary judgment.

The Inland Pacific Chapter of the Associated Builders and Contractors, Inc. ("ABC"), which supported the Act's

---

[1] The latter practice was initially popular, but "made the union responsible for fringe benefits, workers' compensation, and other supplements associated with wages and benefits, plus 'an enormous amount of paperwork for the union, as it had to keep track of each hour worked by each member on a targeted job and then issue checks to each as the work proceeded.'" White, *supra* at 71 (quoting Jack Metzgar, *"Buying the Job" Target Programs and the Elgin Plan*, 1 Lab. Res. Rev. 51, 53 (1988)).  "Now on targeted jobs, the common approach is for the union to make a grant directly to the contractor who wins the job."  *Id.*

[2] The Trades Councils also sought to enjoin another statute, the "Open Access to Work Act," Idaho Code § 44-2013.  In the memorandum disposition filed concurrently with this opinion, we hold that the unions did not establish standing to challenge § 44-2013, vacate the district court's grant of summary judgment as to § 44-2013, and remand with instructions to dismiss the portion of the Trades Councils' complaint challenging § 44-2013.

passage in the legislature, sought to intervene as a defendant in the summary judgment proceedings. The court denied the motion to intervene but permitted ABC to appear as an amicus curiae.

The district court granted summary judgment to the Trades Councils and denied it to the Attorney General, concluding that the Act was preempted by the NLRA. The Attorney General timely appealed.[3] After a limited remand and supplemental briefing on jurisdictional issues not pertinent to this portion of the appeal, the case was resubmitted for disposition on the merits as to the Act.

III.

"Although the NLRA itself contains no express pre-emption provision," the Supreme Court has held that "Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy." *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65 (2008). With regard to the Act, the Trades Councils urge only one of those two preemption strands: the theory articulated in *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959).[4]

---

[3] ABC also timely appealed the court's denial of its motion to intervene, and the two appeals were consolidated. In the memorandum disposition filed concurrently with this opinion, we affirm the district court's decision on the intervention issue.

[4] The other major NLRA preemption theory is "known as *Machinists* pre-emption" and "forbids both the . . . NLRB and States to regulate conduct that Congress intended 'be unregulated because left to be

"*Garmon* pre-emption 'is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA.'" *Brown*, 554 U.S. at 65 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613 (1986)) (some internal quotation marks omitted). "To this end, *Garmon* pre-emption forbids States to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Id.* (quoting *Wisc. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986)).

To eliminate the "danger of conflict" and the "potential frustration of national purposes," *Garmon* provides that, "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." 359 U.S. at 244.[5]    The doctrine,

---

controlled by the free play of economic forces.'" *Brown*, 554 U.S. at 65 (quoting *Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp't Relations Comm'n*, 427 U.S. 132, 140 (1976)) (some internal quotation marks omitted).

[5] Section 7 of the NLRA provides, in relevant part, that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8 defines as a prohibited "unfair labor practice," *inter alia*, an employer's actions "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1).

"based predominantly on the primary jurisdiction" of the NLRB, was devised in light of "experience . . . that [various alternative] methods sacrificed important federal interests in a uniform law of labor relations centrally administered by an expert agency without yielding anything in return by way of predictability or ease of judicial application." *Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp't Relations Comm'n*, 427 U.S. 132, 138–39 (1976) (quoting *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 290–91 (1971)); *see also Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners*, 768 F.3d 938, 951 (9th Cir. 2014).

With one notable exception addressed to the facial nature of this challenge, the Attorney General does not contest that the Act is *Garmon* preempted. With good reason. The NLRB has repeatedly held that job targeting programs are actually protected under § 7 of the NLRA. *See J.A. Croson Co.*, 2012 WL 5246914 at *5; *Kingston Constructors*, 332 N.L.R.B. at 1496–97; *Assoc'd Builders & Contractors, Inc.*, 331 N.L.R.B. 132, 137 (2000), *modified as to remedy*, 333 N.L.R.B. 955 (2001); *Manno Elec., Inc.*, 321 N.L.R.B. 278, 298 (1996). Most recently, the Board reaffirmed its earlier cases by explaining that "the objectives of job targeting programs fall squarely within the ambit of Section 7 of the Act," which "protects concerted employee activities engaged in 'for the purpose of collective bargaining or other mutual aid or protection.'" *J.A. Croson Co.*, 2012 WL 5246914 at *6 (quoting *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–66 (1978)).

We "defer to the NLRB's interpretation of the NLRA" where, as here, "its interpretation is rational and consistent with the statute." *SEIU, United Healthcare Workers-W. v. NLRB*, 574 F.3d 1213, 1214 (9th Cir. 2009) (internal quotation marks omitted) (quoting *UFCW, Local 1036 v. NLRB*, 307 F.3d 760, 766 (9th Cir. 2002)). The Board's interpretation of the NLRA on this score is eminently rational and consistent with the statute. "It is settled that [§ 7's] protections encompass employee attempts 'to improve terms and conditions of employment' with their employer as well as attempts to otherwise 'improve their lot . . . through channels outside the immediate employee-employer relationship.'" *J.A. Croson Co.*, 2012 WL 5246914 at *6 (quoting *Eastex, Inc.*, 437 U.S. at 565–66). As the Board has explained:

> The job targeting program is effectively a union's agreement with an employer to accept a pay cut in order to avoid layoffs or expand job opportunities for represented employees — a bargain that surely lies at the heart of activity protected by Section 7 of the Act. But in the construction industry, an employer often cannot guarantee that it can comply with its end of such a bargain because it must ordinarily bid for work through a competitive process. A union might agree to a pay cut on some jobs in order to secure its members employment on others only to have the employer fail to obtain the work. The job targeting program solves that unique problem by allowing the union to hold the wages

> donated by employees specifically for this
> purpose until the employer secures the
> additional work.  The strategy of job targeting
> to preserve and expand employment
> opportunities for represented employees thus
> plainly seeks to further legitimate goals under
> Section 7.

*Id.*  We agree with the Board that, as a general matter, job targeting programs are a form of collective action aimed at increasing opportunities for union members and so fall within the scope of § 7.

While the Attorney General declines to offer a wholesale defense of the Act, amici contend that the Act, in all its applications, escapes preemption notwithstanding the protections accorded by § 7 of the NLRA.  We address, and reject, these broad arguments before turning to the Attorney General's more limited contention.

ABC argues that the Act is saved from preemption by §14(b) of the NLRA, 29 U.S.C. § 164(b).  Section 14(b) provides that,"Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."  *Id.*  Section 14(b) thus allows states to enact bans on *certain* agreements between unions and employers — ones requiring membership in labor organizations as a condition of employment. *See Oil, Chem. & Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 409 & nn.1 & 2, 416–17

(1976).  Idaho has enacted such a law.  Idaho Code § 44-2003(2).

Idaho codified the Fairness in Contracting Act under the heading "Right to Work," *see* Idaho Code §§ 44-2001 *et seq*., alongside § 44-2003(2), a provision that bans precisely the types of agreements covered by §14(b).  Consequently, ABC contends, the Act is blessed by § 14(b) and freed from preemption.

ABC overreads the scope of § 14(b), which "does not protect a state statute which is so broadly stated or construed."  *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 770 (9th Cir. 1965).  Section 14(b) refers only to certain labor-management agreements — those requiring membership in a labor organization.  As the Supreme Court has made clear, § 14(b) does not allow states to ban agreements other than those described in the statute: "There is nothing in either § 14(b)'s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible."  *Oil, Chem. & Atomic Workers*, 426 U.S. at 413 n.7.  Because no agreement of the sort specifically covered by § 14(b) is at issue in this case, and because "§ 14(b) should not be read as granting states . . . general power to supplant federal labor law," *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1200 (10th Cir. 2002), we conclude that § 14(b) has no bearing on this case.

We likewise reject the argument of a second amicus, the National Right to Work Legal Defense Foundation ("RTW"), that the Act escapes preemption because it is simply a

regulation of the "monies and substantive benefits that may be exchanged between employers and employees."

For one thing, RTW's argument is not responsive to the kind of preemption at issue in this case, namely *Garmon* preemption. Under a *Machinists* analysis, *see supra* note 4, the NLRA does not ordinarily preempt state laws of general applicability governing the "particular substantive terms" that might be the subject of collective bargaining. *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 753 (1985). Thus, for example, the Court has upheld state statutes of general applicability establishing minimum labor standards. *See id.* at 755; *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 19–23 & n.15 (1987); *see also Assoc. Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979, 989 (9th Cir.) (noting that "state minimum benefit protections have repeatedly survived *Machinists* preemption challenges") (quoting *Nat'l Broad. Co. v. Bradshaw*, 70 F.3d 69, 71 (9th Cir. 1995) (internal quotation marks omitted))), *amended by*, 2004 WL 292128 (9th Cir. 2004). *Garmon* preemption is an entirely distinct doctrine, however, focused mainly on protecting the NLRB's primary jurisdiction. If in particular circumstances the application of such general labor standards *would* be actually or arguably protected or prohibited, the *Metropolitan Life* line of cases does not preclude *Garmon* preemption.

Moreover, the Act is completely unlike the even-handed requirements permitted in the cases upon which RTW relies. It does not establish a rule regarding substantive protections for employees generally, union and nonunion. Instead, it facially singles out unions, seeking to ban a particular strategy they employ "to avoid layoffs or expand job

opportunities for represented employees." *J.A. Croson Co.*, 2012 WL 5246914 at *6. That the unions' strategy for effectuating their "legitimate goals under Section 7" of the NLRA, *id.*, happens to involve, in some instances, providing higher wages and benefits to employees than would otherwise be the case, is of no import. Because "the objectives of job targeting programs fall squarely within the ambit of Section 7," *id.*, the Act cannot escape preemption as a purportedly even-handed wage regulation.

IV.

We arrive at the crux of this case. The Attorney General contends that this facial challenge must fail, even though the Act is largely preempted, because it is not entirely so. There are some legitimate applications of the Act, he contends, because the NLRA does not actually or arguably protect job targeting programs funded through wages paid on jobs subject to the requirements of the Davis-Bacon Act, 40 U.S.C. § 3141 *et seq.*[6] Because, he argues, the Trades Councils cannot establish "that no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), the Act is facially valid.

The parties agree that we should apply the *Salerno* standard.[7] Applying it, without deciding whether it is the

---

[6] Davis-Bacon was previously codified at 40 U.S.C. § 276a *et seq*.

[7] *See Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 579 & n.3 (9th Cir. 2008) (en banc); *but see United States v. Arizona*, 641 F.3d 339, 345 n.3 (9th Cir. 2011), *aff'd in part, rev'd in part*, 132 S.

proper standard, we conclude that the Act is facially invalid because it is preempted by the NLRA.

## A.

The Davis-Bacon Act requires that the bid specifications for certain federal public-works projects provide that workers be paid at least the "prevailing wage," as determined by the Secretary of Labor, for similar work in the relevant state. 40 U.S.C. § 3142(a)–(b).  The Act further provides that:

> the contractor or subcontractor shall pay all mechanics and laborers employed directly on the site of the work, unconditionally and at least once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and the laborers and mechanics.

*Id.* § 3142(c)(1).  "The Davis-Bacon Act was intended as a general prohibition or command to a federal agency to require minimum wage stipulations for federal government work contracts."  *Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 676 (9th Cir. 1998)

Ct. 2492 (2012); *see also City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015).

(internal quotation marks omitted); *see also Univs. Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 771–72 (1981). The Department of Labor ("DOL") regulations promulgated to effectuate Davis-Bacon provide that some deductions from the wages due the employees, such as those made for purposes of income tax withholding or as contributions to a retirement account, are permissible. 29 C.F.R. § 3.5.[8] Deductions not specifically permitted are prohibited. 29 C.F.R. § 3.9.

Several cases have held that collecting funds for job targeting programs from wages earned on Davis-Bacon jobs violates the Davis-Bacon Act. *See Brock*, 68 F.3d at 1201; *In re Bldg. & Constr. Trades Unions Job Targeting Programs*, Case No. 90-02, 1991 WL 494718 (Wage App. Bd. June 13, 1991) ("*Building Trades*"), *aff'd sub nom. Bldg. & Const. Trades Dep't v. Reich*, 40 F.3d 1275, 1277 (D.C. Cir. 1994).[9]

The Attorney General leans on this line of authority, arguing that it establishes that job targeting programs are

---

[8] The regulations also allow certain deductions with the permission of the Secretary of Labor. 29 C.F.R. § 3.6.

[9] *Building Trades* was decided by the Wage Appeal Board, which DOL replaced with the Administrative Review Board in 1996. Establishment of the Administrative Review Board, 61 Fed. Reg. 19982-01, 19982 (May 3, 1996). Under current regulations, the Secretary of Labor has delegated to the Administrative Review Board the authority "to hear and decide in its discretion appeals concerning questions of law and fact" regarding, among other things, "[w]age determinations issued under the Davis-Bacon Act." 29 C.F.R. § 7.1(b). We refer to both boards, and the department itself, as "DOL."

generally illegal under Davis-Bacon and therefore are not
arguably protected under § 7 of the NLRA.  We disagree for
two reasons.  First, the only applications of the statute which
the Attorney General defends are those that amount, in
essence, to state enforcement, with criminal sanctions, of
Davis-Bacon; any such enforcement would most likely be
preempted by Davis-Bacon itself, and so cannot qualify as a
"set of circumstances . . . under which the Act would be
valid." *Salerno*, 481 U.S. at 745.  Second, in any event, the
NLRB's precedents regarding job targeting programs and
Davis-Bacon establish that the conduct at issue is at least
arguably protected by the NLRA.

B.

Davis-Bacon governs wages on *federal* public works
contracts.  The application of Idaho's statute to situations in
which Davis-Bacon wages are involved, *because* the use of
Davis-Bacon wages for such programs is purportedly in
violation of the Davis-Bacon Act, would amount to the
enforcement of the federal Davis-Bacon Act by the State of
Idaho.  Idaho can, however, point to no legitimate state
interest in enforcing the federal government's wage rules with
regard to federal projects and contracts.

Rather, it is for the federal government (and, at least in
some situations, the affected workers) to decide if, when, and
how to enforce the provisions of Davis-Bacon.  To that end,
the Davis-Bacon Act provides for civil and administrative
remedies against contractors that violate the its provisions.
So, for example, each contract governed by Davis-Bacon
must provide that, upon discovering a Davis-Bacon wage

violation, "the Federal Government . . . may terminate the contractor's right to proceed with the work or the part of the work as to which there has been a failure to pay the required wages," and the contractor and its sureties are liable for extra costs the government thereby incurs.   40 U.S.C. § 3143. Likewise, the Davis-Bacon Act establishes a list of persons who have "disregarded their obligations to employees and subcontractors," and are therefore barred from receiving federal contracts for three years.   *Id.* § 3144(b).   DOL's regulations also provide for administrative enforcement of the Davis-Bacon Act.   *See, e.g.*, 29 C.F.R. §§ 5.6, 5.7, 5.9, 5.11, 5.12.

Federal law does *not* establish criminal penalties for violations of Davis-Bacon.   *See United States v. Clark*, 787 F.3d 451, 458 (7th Cir. 2015) (noting, in case involving charges of making false statements, that "Davis-Bacon Act violations are not themselves criminal").   The Copeland Act, 18 U.S.C. § 874, provides criminal penalties for conduct related to Davis-Bacon — but only for "*forcing* employees to 'kickback' wages to their employer."   *Brock*, 68 F.3d at 1198 (emphasis added); *see also Reich*, 40 F.3d at 1279.   Davis-Bacon, by contrast, prohibits "a broader array of practices[,] including but not limited to kickbacks."   *Brock*, 68 F.3d at 1199.   There is no criminal penalty for violations of that broader range of conduct proscribed by Davis-Bacon.

The Attorney General's proposed application of the Act would amount to state enforcement of a federal statute governing the federal government's proprietary affairs.   In other words, the Act "adds a state-law penalty for conduct proscribed by federal law."   *Arizona v. United States*, 132 S.

Ct. 2492, 2501 (2012).  Further, the penalty Idaho seeks to impose — a misdemeanor *criminal* conviction resulting in fines of up to $100,000 per violation, Idaho Code § 44-2012(5) — goes far beyond the civil and administrative responses provided by federal law.  Not only does the state of Idaho propose to enforce a statute which it has no business enforcing, but it seeks to do so with criminal penalties far more severe than the non-criminal remedies of federal law.

In this respect, the Attorney General's proposed application of the Act is reminiscent of the state criminal penalty for failure to register as a noncitizen held preempted by the Supreme Court in *Arizona*.  Here, as in *Arizona*, "[t]he federal statutory directives provide a full set of standards . . . , including the punishment for noncompliance," such that "even complementary state regulation is impermissible." 132 S. Ct. at 2502.  "If [the Act] were valid, every State could give itself independent authority to prosecute federal [Davis-Bacon] violations, 'diminish[ing] the [Federal Government]'s control over enforcement' and 'detract[ing] from the integrated scheme of regulation created by Congress.'" *Id.* (some alterations in original) (quoting *Gould*, 475 U.S. at 288–89) (some internal quotation marks omitted) .

Indeed, "[w]ere [the Act] to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that [enforcement] would frustrate federal policies." *Id.* at 2503.  DOL certainly has discretion to determine which Davis-Bacon violations it pursues for enforcement, and has specifically indicated that it "would not

take exception" to certain job targeting programs. *Brock*, 68 F.3d at 1202 n.6 (quoting a letter from the Administrator of DOL Wage and Hour Division) (internal quotation marks omitted). The Act, however, would prohibit and penalize the very programs as to which DOL has decided not to pursue enforcement. Moreover, "[e]ven where federal authorities believe [enforcement] is appropriate, there is an inconsistency between [the Act] and federal law with respect to penalties," as the former provides for large criminal fines while the latter does not. *Arizona*, 132 S. Ct. at 2503.

We need not decide any precise contours regarding the scope of Davis-Bacon preemption. Suffice it to say that the applications of the Act on which the Attorney General relies would most likely be preempted by Davis-Bacon. We therefore cannot agree that they amount to a "set of circumstances . . . under which the Act would be valid." *Salerno*, 481 U.S. at 745.

## C.

Moreover, even restricting our inquiry to the NLRA itself, we conclude that the Act is wholly preempted. The question presented by the Attorney General's argument is whether "the NLRA . . . arguably protects" the job targeting programs banned by the Act if those programs are funded in part from wages earned on Davis-Bacon jobs. *Brown*, 554 U.S. at 65 (internal quotation marks omitted). If such programs are arguably protected, then Idaho "must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted." *Garmon*, 359 U.S. at 245. To prevail, "a party asserting pre-emption" under

*Garmon*'s "arguably" standard need only "advance an interpretation of the Act that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board." *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 395 (1986) (quoting *Marine Eng'rs v. Interlake S.S. Co.*, 370 U.S. 173, 184 (1962)).[10]

Because *Garmon* preemption turns on what the *NLRA* actually or arguably requires (or prohibits), we do not look, in the first instance, to authority interpreting Davis-Bacon, such as that cited by the Attorney General. Instead, we look principally to the decisions of the NLRB to decide whether *Garmon* preemption applies.

Job training programs involve two components: funds are collected, in a variety of ways, from workers' wages, and funds are then distributed, also in various ways, to subsidize union wages on targeted projects. The NLRB has held that, because "requiring the payment of [job targeting] dues as a condition of employment on Davis-Bacon projects" violates Davis-Bacon, such *collection* of funds "is inimical to public policy." *Kingston Constructors*, 332 N.L.R.B. at 1500.[11]

---

[10] In cases, unlike this one, involving the potential application of the Act to specific factual situations, the party asserting preemption "must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation." *Davis*, 476 U.S. at 395.

[11] The Supreme Court has observed that the NLRB must, at times, accommodate federal statutes beyond the NLRA. "Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an

Therefore, *Kingston Constructors* concluded, the union at issue in that case could not lawfully require its members to pay the challenged job targeting dues.

But the Idaho Act at issue in this case does not address itself to a union's *collection* of funds. Rather, the Act prohibits contractors from "*receiv[ing]* a wage subsidy, bid supplement or rebate"; prohibits unions from "*pay[ing]* a wage subsidy or wage rebate"; and prohibits, generally, the "*use*" of funds collected by or on behalf of a union "to subsidize a contractor or subcontractor." Idaho Code § 44-2012(2)–(4) (emphasis added). The Act stipulates that all such actions are prohibited only with regard to funds "the source of which is wages, dues or assessments collected by or on behalf of any labor organization(s)." Idaho Code § 44-2012(2). Still, the actions prohibited by the Act are the distribution of funds, not their collection.

No NLRB case has held collective action by employees to subsidize wages on non-Davis-Bacon jobs by distributing funds to the workers or employers on those jobs is not protected concerted activity under § 7 because of the source of those funds. As to distribution of funds derived from Davis-Bacon wages, the NLRB, far from holding that the *use* of funds collected from Davis-Bacon wages is unprotected under § 7 of the NLRA once held that use protected in some

---

administrative body that it undertake this accommodation without excessive emphasis upon its immediate task." *S. S.S. Co. v. NLRB*, 316 U.S. 31, 47 (1942); *see also Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 142–44 (2002).

circumstances and, more recently, has specifically reserved
the question.

*In Re Can-Am Plumbing, Inc.*, 335 N.L.R.B. 1217, 1217
(2001) ("*Can-Am I*"), *petition granted*, 321 F.3d 145 (D.C.
Cir. 2003) ("*Can-Am II*"), held that "prosecut[ing] a state
court lawsuit against [a] competitor employer . . . for
accepting job targeting program funds" from a union was an
unfair labor practice under § 8, because the program itself
was protected under § 7.  That was so despite "[t]he Board's
recent holding in *Kingston Constructors* that unions may not
lawfully exact dues from employees working on Davis-Bacon
projects to support job targeting programs."  *Id.* (citation
omitted).  *Can-Am I* went on to explain that the targeted job
was not a Davis-Bacon project and that the challenged
contractor had never worked on a Davis-Bacon project.  *Id.*
Furthermore, the NLRB noted, only 2–3% of the union's job
targeting funds came from federal or state prevailing-wage
jobs.  *Id.*  In sum, *Can-Am I* held the distribution of those
funds actually protected under the NLRA, despite the fact that
some small portion of them was apparently derived from
Davis-Bacon wages.

The D.C. Circuit granted a petition for review of *Can-Am*
and remanded the matter back to the NLRB.  *Can-Am II*,
321 F.3d at 147.  Can-Am had offered essentially the same
argument urged by the Attorney General in this case,
"contend[ing] that because the [NLRA] does not protect [job
targeting programs] that offend public policy, and the
Union's [program] is contrary to both federal and state
Davis-Bacon laws, Can-Am's lawsuit is not preempted under
*Garmon*."  *Id.* at 151.  After examining at length the cases

regarding the *collection* of funds on Davis-Bacon jobs, *Can-Am II* held that "[t]he Board's conclusory findings that these moneys did not taint the job targeting program are inadequate to support its determination that the operation of the program as a whole was protected conduct under section 7." *Id.* at 147. The court noted, specifically, that the NLRB did not "explain why the Davis-Bacon moneys did not affect the [job targeting program's] legality or why the Union's conduct in that regard was excusable," and went on to observe that "[n]o court or administrative decision of the Board has yet defined precisely how much Davis-Bacon money may flow into a [job targeting program] before the program violates public policy." *Id.* at 153. *Can-Am II* therefore remanded the matter for further consideration, noting that, after accepting additional evidence, "the Board on remand may yet determine that the [job targeting program] is protected under section 7." *Id.* at 154.

On remand, the NLRB determined that Can-Am had waived the remanded issue by not previously contending that the inclusion of monies derived from Davis-Bacon wages rendered the program unprotected. *Can-Am Plumbing, Inc.*, 350 N.L.R.B. 947, 949 (2007) ("*Can-Am III*"). In the process, the Board provided an important gloss on its earlier decision:

> Of course, [the Board's prior discussion of the inclusion of a small amount of Davis-Bacon wages in the job targeting program at issue in that case] should not be interpreted to mean that the inclusion of contributions from wages earned on Davis-Bacon projects would be

> unlawful.  *The Board has not ruled on that
> question and it is not raised here*.

*Id.* (emphasis added).  The Board quite pointedly, then, left
the issue presented in this case open.

The NLRB has not revisited the matter since the *Can-Am
Plumbing* litigation.  The closest it has come was *J.A. Croson
Co.*, 2012 WL 5246914.  Contrary to the Attorney General's
suggestion, that case did nothing to undermine the arguable
protection of the conduct regulated by the Act, and indeed
underscored it.[12]

Croson, a non-union contractor, sued J.A. Guy, Inc., a
union contractor, in Ohio state court, alleging that Guy's
deduction of a job targeting assessment from its employees'
wages violated Ohio's statutes and regulations requiring
prevailing wages on public works projects, a type of law

---

[12] The Supreme Court has held that two of the four Board members who
decided *J.A. Croson Co.*, Members Griffin and Block, were not validly
appointed by the President.  *NLRB v. Noel Canning*, 134 S. Ct. 2550,
2557, 2578 (2014).  Although *J.A. Croson Co.* was extensively discussed
in the parties' briefing, no party in this case has raised the precedential
viability of *J.A. Croson Co.* in light of *Noel Canning*.  In any event, the
principal significance of *J.A. Croson Co.* to this case is the light it sheds
on whether the conduct proscribed by the Act is *arguably* protected.
Whether *J.A. Croson Co.* remains good law, or is only a non-authoritative
statement from two Board members and two putative Board members,
does not much matter for the purposes of deciding whether distribution of
job targeting funds derived in part from Davis-Bacon wages — a matter
that, as we shall explain, was not at issue in *J.A. Croson Co.* — is
arguably protected.  With this caveat, we refer to the decision in *J.A.
Croson Co.* as the opinion of the NLRB.

known as a "Little Davis-Bacon." *Id.* at *2. The Ohio Supreme Court held the lawsuit preempted by the NLRA. *J.A. Croson Co. v. J.A. Guy, Inc.*, 691 N.E.2d 655, 665 (Ohio 1998). Guy then filed a charge with the NLRB, alleging that Croson's maintenance of the suit was prohibited by § 8 because the job targeting program was protected by § 7. *J.A. Croson Co.*, 2012 WL 5246914 at *4. The NLRB held that, despite a determination from the Ohio Department of Industrial Relations that Guy had violated the Little Davis-Bacon statute, the job targeting program was actually protected and so the suit was an unfair labor practice. *Id.* at *5, 6.

The Board took pains to emphasize that no federal Davis-Bacon issue was presented in *J.A. Croson Co*. *See id.* at *8; *see also id.* at *7 n.20. But the Attorney General suggests that, by seizing on the federal-state distinction in *J.A. Croson Co.*, the NLRB indicated that such programs are protected when only state wages are involved and are *not* protected when federal Davis-Bacon wages are used.

We do not read *J.A. Croson Co.* that way. In that case, as in *Kingston Constructors*, the underlying conduct was the *collection* of funds. *See id.* at *2, 7–8; *see also id.* at *18 n.7 (Member Hayes, dissenting). And, as we have already explained, *Kingston Constructors* held, in deference to the DOL and two circuit courts, that the collection of such funds from federal Davis-Bacon wages was inimical to public policy. It therefore makes sense that *J.A. Croson Co.* would distinguish between federal and state funds in determining whether the *collection* of monies for job targeting programs is protected. *J.A. Croson Co.* did not decide the question

reserved in *Can-Am III*, namely whether the *distribution* of those funds is protected.

Moreover, *J.A. Croson Co.* suggests that, if the issue were squarely presented, the NLRB might hold the *payment* of funds derived from Davis-Bacon wages actually protected under § 7. First, the NLRB notably took the "opportunity" afforded by *J.A. Croson Co*. to reiterate yet again that job targeting programs are generally protected by the NLRA, and gave its most full-throated defense to date of the protected nature of such programs in general. *Id.* at *6.

Second, *J.A. Croson Co.* emphasized the extent to which *Kingston Constructors* was, with regard to Davis-Bacon, based on deference to the DOL. *See id.* at *7.[13] We read *J.A.*

---

[13] It is doubtful that the DOL would have the authority directly to regulate the *distribution* of funds derived from Davis-Bacon wages to contractors not working on Davis-Bacon jobs. *Cf. Reich*, 40 F.3d at 1288 (Edwards, C.J., dissenting) (noting that "[e]ven the Labor Department's Wage and Hour Administrator admits that wage deductions on [non-Davis-Bacon] projects are beyond the scope of the Department's authority"). Neither the Davis-Bacon Act nor the associated regulations mention such distribution. *Cf. Building Trades*, 1991 WL 494718 at *5–6. Some of the opinions we have discussed include broad language which can be read to suggest that distribution of funds derived from Davis-Bacon wages to non-Davis-Bacon contractors might be a violation of the Davis-Bacon Act. *See Brock*, 68 F.3d at 1201; *Reich*, 40 F.3d at 1280; *Building Trades*, 1991 WL 494718, at *6. As noted, however, the *distribution* of funds was not the issue in any of those cases. Furthermore, insofar as such broad statements indicate concern about the potential job targeting programs have for warping future prevailing wage determinations, we note that the method by which the DOL determines the prevailing wage is not prescribed in the Davis-Bacon Act. Nothing in Davis-Bacon precludes

*Croson*'s emphasis on the role of deference in *Kingston Constructors* as an indication that, were the issue in this case presented to the NLRB, it might well hold the distribution of job targeting funds, even if some were derived from Davis-Bacon wages, is protected as a form of employee concerted activity not in violation of any public policy firmly established by another statute.

In asserting *Garmon* preemption, the Trades Councils bear the burden "to demonstrate that [this issue] is one that the Board could legally decide in [their] favor." *Davis*, 476 U.S. at 395. This is not a demanding standard; the Trades Councils need not, for example, show that the Board *will* or is even *likely* to ultimately agree with their position. Rather, they need only "advance an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been authoritatively rejected by the courts or the Board." *Id.* (internal quotation marks omitted).

The Trades Councils have met this burden. The NLRB's decisions in the *Can-Am* litigation, as well as its recent discussion in *J.A. Croson Co.*, convince us that the Trades Councils' interpretation of § 7, as protecting the distribution of funds contributed to job targeting programs when some of the contributions are traceable to wages employers earned on Davis-Bacon covered projects, is, at the very least, arguable.

---

DOL from requiring disclosure of data on job targeting spending, to ensure that future prevailing wage determinations are accurate.

V.

The Attorney General and ABC contend that, even if the use of funds derived from Davis-Bacon wages is arguably protected, preemption is nonetheless inappropriate. Their arguments are meritless.

ABC argues that the Act escapes preemption because "there is a sufficiently deeply rooted state interest in proscribing the collection and use of employee monies to undermine free and fair competition," as evidenced by Idaho's expansive right-to-work legislation. *Garmon*'s exception for cases in which "the regulated conduct touche[s] interests . . . deeply rooted in local feeling and responsibility," 359 U.S. at 244, does not, however, extend to local interests *in labor policy*, except to the extent permitted by § 14(b). On the contrary, the NLRA "replaced" local labor policy with "an unequivocal national declaration of policy establishing the legitimacy of labor unionization and encouraging the practice of collective bargaining." *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 190 (1978). No matter how deeply rooted in local feeling Idaho's views on labor relations may be, they do not for that reason escape preemption.

Moreover, the notably *federal* nature of the state's purported interest is also relevant with regard to ABC's argument. A purported state interest in banning job targeting distributions because they include funds derived from Davis-Bacon wages earned on federally funded projects, is not a "significant *state* interest." *Id.* at 196 (emphasis added). Rather, as we have explained, such an interest would be

purely *federal*, and therefore could not warrant an exception to otherwise-applicable *Garmon* preemption.

We likewise are unpersuaded by the Attorney General's contention that the Trades Councils' argument for § 7 protection as to programs which include funds derived from Davis-Bacon wages is weak, and that therefore, even if that protection is technically arguable, preemption is not warranted under *Sears*. *Sears* noted that "the acceptability of 'arguable protection' as a justification for pre-emption in a given class of cases is, at least in part, a function of the strength of the argument that § 7 does in fact protect the disputed conduct." 436 U.S. at 203.

Initially, as we have explained, based on the NLRB's various decisions bearing on this case, the Trades Councils' argument for § 7 protection has substance. It therefore does not trigger the *Sears* exception relied upon. Moreover, while, in arguing for a *Sears* exception, the Attorney General relies only on his assessment of the strength of the § 7 argument, we note that *Sears* was quite different from this case in several other respects. First, unlike *Sears*, which involved generally applicable trespass law, the Act is a "state law[] regulating the relations between employees, their union, and their employer," a situation in which the *Garmon* reasoning "has its greatest force." *Id.* at 193; *see also id.* at 197 n.27. Second, as we have explained, unlike the cause of action in *Sears*, the Act as applied to funds derived from Davis-Bacon projects does not regulate any "significant state interest" "deeply rooted in local feeling and responsibility." *Id.* at 195–96 (quoting *Garmon*, 359 U.S. at 244) (internal quotation marks omitted). Third, unlike in *Sears*, it cannot be

said that the Act would "entail[] little risk of inference with the regulatory jurisdiction" of the NLRB. *Id.* at 196; *see also id.* at 201. An Idaho court seeking to apply the Act to a case involving funds derived from Davis-Bacon wages would have to answer the "identical" question reserved in *Can-Am III*: Is such a program protected by § 7? Fourth, and finally, we see no reason to conclude that this case implicates the concerns presented in *Sears* that preemption would create a jurisdictional "no-man's land." *Id.* at 208 (Blackmun, J., concurring). *Can-Am III* declined to address the § 7 argument at issue here only because the respondent had waived the issue. 350 N.L.R.B. at 949.

## VI.

All of the conduct prohibited by the Act is either actually or arguably protected under § 7, and no exception to preemption applies. The Act is therefore facially preempted under *Garmon*.

The Trades Councils sought a declaration and permanent injunction, but the district court's order did not explicitly refer to any particular relief, stating only that the Acts were preempted and so the Trades' Councils' motion for summary judgment was granted. Confusingly, the court's judgment also stated that the case was "dismissed." We remand for the district court to award appropriate relief and enter an appropriate judgment.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

BERZON, Circuit Judge, concurring:

As the main opinion explains, the "Fairness in Contracting Act," Idaho Code § 44-2012, is not saved from NLRA preemption by the line of precedent holding that collection of Davis-Bacon wages for job targeting programs violates the Davis-Bacon Act. *See Int'l Bhd. of Elec. Workers, Local 357, AFL-CIO v. Brock*, 68 F.3d 1194, 1201–03 (9th Cir. 1995); *In re Building & Constr. Trades Unions Job Targeting Programs*, Case No. 90–02, 1991 WL 494718 (Wage App. Bd. June 13, 1991) ("*Building Trades*"), *aff'd sub nom. Building & Const. Trades Dep't, AFL-CIO v. Reich*, 40 F.3d 1275, 1277 (D.C. Cir. 1994). I write separately to observe that these cases, and in particular our decision in *Brock*, were, in my view, wrongly decided.

*First*, I see no basis to conclude that any aspect of job targeting programs amounts to a violation of federal law. The Davis-Bacon Act requires contractors on covered projects to pay to workers "the full amounts accrued at time of payment," computed at rates not less than the advertised rates. Those rates must be not less than prevailing wages, "without *subsequent* deduction or *rebate* on any account." 40 U.S.C. § 3142(c) (emphasis added). A rebate is "[a] *return* of part of a payment" that has already been made. *Rebate*, *Black's Law Dictionary* (10th ed. 2014). A deduction could refer to money taken out at the time the wages are paid, but the statute specifically bans only "*subsequent*" deductions. Thus, Congress was likewise referring only to deductions made *after* the wages were paid, presumably from later wage payments. We have previously examined Congress's concern, in amending Davis-Bacon to include the

"subsequent deduction or rebate" language, with "the illegal practices of exacting rebates or kickbacks." *Brock*, 68 F.3d at 1199 (quoting S.Rep. No. 1155, 74th Cong., 1st Sess. 2, at 3 (1935); H.R.Rep. No. 1756, 74th Cong., 1st Sess. 2, at 3 (1935)). Notably, both those practices involve *returning* money to a contractor on the Davis-Bacon job after it was initially paid.

How, then, did we end up concluding that job targeting deductions made at the time a worker is paid contravene Davis-Bacon? The Department of Labor has promulgated regulations that bar *all* deductions from workers' pay on Davis-Bacon jobs unless those deductions are specifically permitted by the DOL, either categorically or by individual prior permission. 29 C.F.R. §§ 3.5, 3.6, 3.9. DOL's decision in *Building Trades* was principally an interpretation of these regulations. *See* 1991 WL 494718 at *5–6. The NLRB, and this court, subsequently deferred to DOL on the matter. *See Int'l Bhd. of Elec. Workers, Local 48*, 332 N.L.R.B. 1492, 1500–01 (2000), *order modified by* 333 N.L.R.B. No. 122, *enforced*, 345 F.3d 1049 (9th Cir. 2003); *Brock*, 68 F.3d at 1203. But no court has, to my knowledge, explained how the regulations — which purport to ban, with specified exceptions, *all* deductions, simultaneous *or* subsequent — are anything but "inconsistent with the statute," *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002), which bans only *subsequent* deductions.

I do not mean to suggest that Congress would bless an arrangement in which a contractor deducts a worker's wages as a way of sidestepping the prevailing wage requirement — for example, a deduction for a fund to pay for the contractor's

summer home. Davis-Bacon is, to be sure, concerned with ensuring that workers really received in the first place the prevailing wages mandated by Davis-Bacon. *Brock*, 68 F.3d at 1199. In other words, a worker must *actually* be paid the prevailing wage; a scheme to make it look as though he had been paid that wage, when in fact some portion of it returns to the contractor paying him, is unacceptable.

A rule barring such reductions to effectuate this Congressional purpose cannot, however, be grounded in the statutory provision barring "subsequent deductions." Such arrangements involve "contemporaneous" deductions, not a "subsequent deduction or rebate." Rather, I would hold that simultaneous deductions are impermissible when they amount to a scheme to avoid paying a prevailing wage. And I would apply a simple presumption to rule out many deductions that are patently consistent with Davis-Bacon: When a deduction is authorized by law, it is not a scheme to sidestep Davis-Bacon. Thus, for example, there is no need for specific authorization to deduct wages as income tax withholding; or for retirement accounts authorized by the Internal Revenue Code; or for the various purposes authorized by the Fair Labor Standards Act. *Cf.* 29 C.F.R. § 3.5. As applied here, it would not matter whether job targeting funds are considered union dues or not, as both job targeting funds and dues are authorized by § 7 of the NLRA, according to the NLRB cases discussed in the majority opinion. Therefore, I would hold, Davis-Bacon is simply not implicated by the collection from Davis-Bacon wages of assessments for union-authorized job-targeting programs, whether by way of mandatory wage deductions or otherwise. As it stands, "the Secretary's interpretation perverts the purpose of the Davis-

Bacon Act, transforming a statute designed to benefit laborers into one that bars them from benefitting themselves." *Reich*, 40 F.3d at 1283 (Edwards, C.J., dissenting).

*Second*, even assuming that DOL is right and that deductions for job targeting funds amount to a violation of the Davis-Bacon Act, *Brock* is sorely mistaken in holding that even direct payments from a worker to his union, with no involvement by the employing contractor, also constitute Davis-Bacon violations.

Davis-Bacon bars schemes in which it would appear the worker was paid a prevailing wage but in reality he was not. *Brock*, 68 F.3d at 1199. But — apart from such schemes — the worker is otherwise fully entitled to spend his wages as he sees fit. This observation is so obvious that it should not be necessary to make it. Yet our opinion in *Brock* is fundamentally at odds with this common sense understanding.

*Brock* held that a union local's requirement that union members pay an assessment to support a job targeting program was a violation of Davis-Bacon. *Id.* at 1196. Unlike the employer in *Reich*, the employing contractor in *Brock* had no involvement with the job targeting program. *Id.* at 1201. Not only did that contractor not receive job targeting funds — and, according to the union in that case, the contractor never could receive such funds — the contractor also made no deductions for the job targeting program. *Id.* at 1199, 1201. Instead, "union members pa[id] the two percent assessment directly to the union." *Id.* at 1200. The fact that there was no deduction in *Brock*, only a required payment directly to the

union, was immaterial, this court held, as in either event "the local union serves as an intermediary that impermissibly effectuates the reduction of employee's wages for work performed on government projects to the benefit of *contractors*." *Id*. (emphasis added). Indeed, the court held the same would be true "[e]ven if the Workers *voluntarily* paid the two percent gross wage assessments." *Id*. at 1202.

This focus on "contractors" in general is all wrong. Davis-Bacon prevents a worker from returning part of his wages to *the particular contractor* who pays him, or to an agent or subcontractor of that contractor; it is not about preventing workers from giving part of their wages to *contractors in general*. *Cf.* 40 U.S.C. § 3142(c)(3) (providing that funds may be withheld from "the contractor" to pay "the difference between the rates of wages required by the contract to be paid laborers and mechanics on the work and the rates of wages received by the laborers and mechanics and not refunded to *the contractor* or subcontractors or their agents") (emphasis added); 29 C.F.R. § 3.5(d)(3) (permitting certain deductions, with DOL's approval, provided that "[n]o profit or other benefit is otherwise obtained, directly or indirectly, by *the contractor* or subcontractor or any affiliated person in the form of commission, dividend, or otherwise") (emphasis added); *but see Can-Am Plumbing, Inc. v. N.L.R.B.*, 321 F.3d 145, 152 (D.C. Cir. 2003) (concluding otherwise, based in part on *Brock*). On this point, I emphatically agree with Judge Edwards's dissent in *Reich*. As Chief Judge Edwards said, the plain language of Davis-Bacon, which refers to "the 'contractor or his subcontractor' in the singular, not contractors or subcontractors in the plural[,] . . . focuses the Act narrowly on deductions taken for use by the very

contractor or subcontractor who signs the paycheck." *Reich*, 40 F.3d at 1283 (Edwards, C.J., dissenting).

Otherwise, a contractor would violate Davis-Bacon anytime a worker uses part of his Davis-Bacon wages to pay the contractor who is putting a new roof on his house; or uses the wages to buy stock shares in a contractor's company (or a company that itself awards contracts); or, perhaps, deposits his wages in a bank that makes loans to contractors. All of those scenarios involve the worker's transfer, either directly or indirectly, for his own purposes, of funds earned on a Davis-Bacon job to *some* construction industry contractor in a way that benefits the contractor. But Davis-Bacon does not care that workers give money to *a* contractor; it merely seeks to prevent the workers' wages redounding to *the* contractor who paid them in the first place, such that, in effect, the worker was paid less than prevailing wage.

Unless Davis-Bacon purports to establish near-plenary regulation over what workers may do with their money after they have been paid — a goal that makes no sense at all, even assuming it would be permissible — it must be limited to the actual subject-matter of the statute, namely ensuring that workers are actually paid a prevailing wage. What workers do with their money at that point, either individually or collectively through a union, is of no concern to Davis-Bacon.

That being the case, *Brock* was wrongly decided. If a union's members pool their resources to fund a job targeting program, that may be of concern under the NLRA (if impermissible coercion is involved, for example, see

29 U.S.C. § 158(b)(1)), but it is of no concern under the Davis-Bacon Act. The workers *were* paid a prevailing wage, and they collectively decided to use some of that wage to subsidize *other* contractors for the workers' collective benefit. Even more clearly, if individual workers *voluntarily* pay into a job targeting fund, Davis-Bacon can have no more objection than it can have to workers voluntarily spending their wages at the hardware store rather than the drug store. The workers were paid prevailing wages, so Davis-Bacon is satisfied.

*Brock* concluded otherwise, contending that "there is no tenable distinction between (1) direct deductions of employee wages on government projects . . . and (2) union-required employee payment of a percentage of their wages earned on government projects," and suggesting that "[t]o distinguish between the two methods of JTP assessment would be to elevate unacceptably form over substance."  68 F.3d at 1200–01.  Yet, as Chief Judge Edwards noted in his dissent in *Reich*, the DOL had in that case "conceded that the regulations do not prohibit unions from increasing their general dues assessment and then internally allocating a portion of that assessment to fund job targeting programs." *Reich*, 40 F.3d at 1286 (Edwards, C.J., dissenting).

I agree the distinction is ridiculous.  But that is no reason to expand the scope of Davis-Bacon to conduct that has nothing to do with its language or purpose.  Rather, the distinction at issue — while earmarked payroll deductions to fund job training programs are unlawful, mandatory dues used internally to fund them are fine — is attributable to DOL's regulations and its interpretations of them, which

carve out certain deductions as permitted but do not permit workers collectively to decide to spend their own money in this particular way. *See id*. (concluding that it was DOL's interpretation of Davis-Bacon itself that "elevates form over substance"). The latter decision has essentially nothing to do with the goals of Davis-Bacon.

In sum, in my view, DOL's regulations barring such deductions contravene the language and intent of Davis-Bacon, and I would not defer to them. Moreover, even taking DOL's position on the deductions piece of this morass as given, I would urge the court to reconsider *Brock* in a case in which, unlike this case, a challenge to the ban on contributions to union-instigated job-targeting funds traceable to Davis-Bacon job wages is squarely presented.